[No. A104481. First Dist., Div. Three. Oct. 19, 2005.]

PEREGRINE FUNDING, INC., et al., Plaintiffs and Respondents, v. SHEPPARD MULLIN RICHTER & HAMPTON LLP, Defendant and Appellant.

660

662

COUNSEL

Rogers Joseph O'Donnell & Phillips, Pamela Phillips, Sean M. SeLegue and John S. Throckmorton for Defendant and Appellant.

Bartko, Zankel, Tarrant & Miller, John J. Bartko, Robert H. Bunzel and Howard L. Pearlman for Plaintiff and Respondent.

OPINION

McGUINESS, P. J.—This case is one of several arising from the collapse of a large Ponzi scheme.[1] Plaintiffs—investors who lost millions in the scheme and a bankruptcy trustee representing entities that were used to perpetrate the scheme—have sued the law firm Sheppard Mullin Richter & Hampton LLP (Sheppard), claiming its negligence and affirmative misconduct helped the perpetrators of the scheme avoid detection and prosecution by securities regulators. Sheppard filed a special motion to strike the complaint under Code of Civil Procedure section 425.16, subdivision (b)(1),[2] which provides a means for early dismissal of unmeritorious claims that target the defendant's constitutionally protected speech or petitioning activity. After the trial court denied its motion, the firm filed this interlocutory appeal. We conclude the

---

[1] "A Ponzi scheme is a fraudulent investment scheme where '[m]oney from the new investors is used directly to repay or pay interest to old investors, [usually] without any operation or revenue-producing activity other than the continual raising of new funds. This scheme takes its name from Charles Ponzi, who in the late 1920s was convicted for fraudulent schemes he conducted in Boston.' [Citation.]" (*People v. Williams* (2004) 118 Cal.App.4th 735, 739, fn. 2 [13 Cal.Rptr.3d 569].)

[2] All statutory references are to the Code of Civil Procedure unless otherwise stated.

motion to strike should have been granted in part because plaintiffs' claims are partially based on protected activity and some plaintiffs did not establish the requisite likelihood of prevailing. Specifically, we conclude the bankruptcy trustee's claims on behalf of one entity are barred by the doctrine of unclean hands and the investors' claims are barred by the applicable statute of limitations. Accordingly, we reverse and direct the trial court to enter an order granting the motion to strike as to these plaintiffs.

## BACKGROUND

While it lasted, the Ponzi scheme alleged in this case was disguised as a successful mortgage lending business. (See *Union Bank of California v. Superior Court* (2005) 130 Cal.App.4th 378, 384–385 [29 Cal.Rptr.3d 894] [describing the factual allegations of disgruntled investors in a related case arising from the scheme].) According to the first amended complaint,[3] James Hillman and Michael Fanghella established PinnFund USA, Inc. (PinnFund) in the late 1990's as a company to originate, purchase and sell sub-prime mortgage loans, with Fanghella serving as its chief executive officer. Hillman created three businesses—Allied Capital Partners, Grafton Partners and Six Sigma LLC (collectively, the Funding Entities)—to solicit funds for investment in PinnFund mortgages. These Funding Entities were all managed by Peregrine Funding, Inc. (Peregrine), a corporation owned and controlled by Hillman and his wife. Although contracts between PinnFund and the Funding Entities required all investor funds to be placed in a trust account and used for the sole purpose of funding loans, Hillman and Fanghella looted the account to pay fictional returns to earlier investors and to enrich themselves and other "insider confederates" with millions of dollars in phony commissions and fees. The scheme allegedly bilked investors of over $300 million and resulted in federal criminal charges against Fanghella and Hillman.

Attorney William Manierre represented Hillman, Peregrine and two of the Funding Entities beginning in 1995, and he continued to represent them after he joined the Sheppard firm in October 1997. In February 1999, Sheppard prepared two opinion letters for Hillman that plaintiffs claim contain negligent or reckless legal advice. In what the complaint refers to as the "IAA Comfort Letter," Sheppard concluded Peregrine was not required to register as an investment advisor under applicable California or federal laws. Plaintiffs allege this advice was wrong and Sheppard issued it knowing the letter was intended to be used for the sole purpose of soliciting investors, in that its securities registration analysis apparently endorsed the legitimacy of the

---

[3] All references to the complaint are to the first amended complaint.

enterprise. In the "ICA Comfort Letter," and an October 2000 update to this letter, Sheppard advised Hillman that the Funding Entities were not required to register as investment companies under federal securities law so long as they had fewer than 100 investors. Aware that Hillman sought to increase the number of PinnFund investors yet still evade registration laws, Sheppard advised that the law's 100-investor limitation could be circumvented by the creation of a "super accredited investment entity." Thereafter, Hillman created a third company (Six Sigma LLC) for this purpose, allowing the scheme to raise—and lose—additional investment funds.

But the scheme began to collapse in September 2000 when a large investor withdrew its $22 million in capital. Two months later, the Securities and Exchange Commission (SEC) commenced an investigation, and in February 2001 the SEC served subpoenas on Hillman, PinnFund, Peregrine and the Funding Entities. The complaint alleges that in February and March 2001, Sheppard counseled Hillman and the Funding Entities about whether to cooperate with the government's demands, and on behalf of these clients refused to produce subpoenaed documents and witnesses.

On March 21, 2001, the SEC filed suit against Hillman, Fanghella, PinnFund and the Funding Entities for violation of federal securities laws. During this time, the complaint alleges Sheppard continued to represent the Funding Entities and Peregrine but acted to their detriment in serving the needs of its coclient Hillman. Specifically, Sheppard opposed provisional relief sought by the government and fought the appointment of a receiver. In addition, "Sheppard advised government lawyers in late March 2001 that Hillman would not testify, and if the government insisted that he testify, Sheppard 'would put the Funding Entities into bankruptcy' in order to derail or disrupt the SEC action." To this end, Sheppard consulted with bankruptcy counsel in March 2001. On April 2, 2001, after the SEC obtained a temporary restraining order freezing the assets of Hillman and the Funding Entities, and shortly after the SEC began deposing Hillman, the Funding Entities filed a voluntary petition for bankruptcy and Sheppard filed a notice withdrawing as their counsel. The firm continued to represent Hillman through the duration of the SEC action, however, and was his counsel of record in the federal criminal case that was later brought against him.

Plaintiff Richard M. Kipperman was appointed the bankruptcy trustee of Peregrine and the Funding Entities in September 2001. Although Kipperman asked the firm to turn over all documents and files pertaining to its representation of these clients, the complaint alleges Sheppard provided only a small portion of the materials requested "in willful concealment of its misconduct."

Plaintiffs[4] filed a complaint against Sheppard on March 19, 2003, and an amended complaint on May 12, 2003. The complaint asserts two causes of action—professional malpractice and aiding and abetting a breach of fiduciary duty—based on Sheppard's registration analysis and advice in 1997 through early 2001 and its allegedly conflicted representation of adverse parties in the 2001 SEC action. Plaintiffs claim Sheppard's advice in the IAA and ICA Comfort Letters was a substantial factor in causing investor losses because it enabled Hillman to evade registration requirements that would have alerted regulators and investors to the perpetrators' illegal activities. Plaintiffs also claim they were damaged by Sheppard's representation of Hillman in the SEC action in that the firm: (1) blocked the SEC's investigation and delayed provisional relief; and (2) assisted Hillman's exit from the Ponzi scheme by helping him implement a so-called dividend reinvestment program that recycled investor returns instead of distributing them to investors.

In response, Sheppard filed a special motion to strike the complaint as a SLAPP (strategic lawsuit against public participation) suit, pursuant to section 425.16.[5] Sheppard argued the suit fell under section 425.16 because both of plaintiffs' claims arose from the firm's protected speech and "litigation activity" on behalf of its clients, and plaintiffs could not establish the requisite likelihood of success because the investors' claims were barred by the statute of limitations and the trustee's claims were barred by standing rules and the equitable doctrine of unclean hands.[6] The trial court denied the motion, however, concluding section 425.16 was not triggered because plaintiffs' claims did not arise from any acts by Sheppard in furtherance of its right of petition or free speech in connection with a public issue. While noting this finding did not require it to reach the second prong of a section 425.16 analysis, the trial court's order proceeded to observe that plaintiffs had stated and substantiated legally sufficient claims against Sheppard and the court could not conclude, on the record presented, that the claims were barred by any of the defenses asserted by Sheppard.

---

[4] Plaintiffs are: bankruptcy trustee Kipperman, asserting claims on behalf of Peregrine and the Funding Entities, and investors Tom Frame, Bruce Miller and Ronald G. VandenBerghe, asserting claims on behalf of themselves and a putative class of bilked investors.

[5] Sheppard also filed a demurrer and motions to strike the complaint under section 436 and Civil Code section 1714.10. The trial court overruled the demurrer and denied the motions to strike; however, only its ruling on the special motion to strike was immediately appealable. (§§ 425.16, subd. (j), 904.1, subd. (a)(13).)

[6] Sheppard raised these same challenges—to the trustee's standing and clean hands and to timeliness of the investors' claims—in its demurrer.

## DISCUSSION

### I. *Section 425.16 Applies to Claims Partially Based on Protected Activity*

█ Section 425.16 provides for the early dismissal of certain unmeritorious claims by means of a special motion to strike. (See *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 102 [15 Cal.Rptr.3d 215] [purpose of the statute is to encourage participation in matters of public significance by allowing prompt dismissal of unmeritorious claims concerning a defendant's constitutionally protected speech or petitioning activity].) In this regard, the statute states: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

█ Consideration of a section 425.16 motion to strike involves a two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].)

█ A defendant who files a special motion to strike bears the initial burden of demonstrating that the challenged cause of action arises from protected activity. (*Brill Media Co. v. TCW Group, Inc.* (2005) 132 Cal.App.4th 324, 329 [33 Cal.Rptr.3d 371]; see also *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 66.) However, as our Supreme Court has observed, "the 'arising from' requirement is not always easily met. [Citations.]" (*Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 66.) A cause of action does not "arise from" protected activity simply because it is filed after protected activity took place. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76–77 [124 Cal.Rptr.2d 519, 52 P.3d 695].) Nor does the fact "[t]hat a cause of action arguably may have been triggered by protected activity" necessarily entail that it arises from such activity. (*Id.* at p. 78.) The trial court must instead focus on the substance of the plaintiff's

lawsuit in analyzing the first prong of a special motion to strike. (*Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404, 413–414 [9 Cal.Rptr.3d 242]; see *City of Cotati v. Cashman, supra,* 29 Cal.4th at p. 78.) In performing this analysis, the Supreme Court has stressed, "the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.]" (*City of Cotati v. Cashman, supra,* 29 Cal.4th at p. 78.) In other words, "the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.]" (*Ibid.*)

"In deciding whether the 'arising from' requirement is met, a court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b).)" (*City of Cotati v. Cashman, supra,* 29 Cal.4th at p. 79.) On appeal, we independently determine whether this material demonstrates that the cause of action arises from protected activity. (*Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, 629 [7 Cal.Rptr.3d 715].)

Here, plaintiffs allege essentially two phases of misconduct by Sheppard. First, in the February 1999 and October 2000 "comfort" letters, Sheppard counseled Hillman and Peregrine on strategies to avoid federal and state registration requirements. Plaintiffs complain this advice assisted Hillman in recruiting investors and enabled the scheme to escape the notice of securities regulators for a period of time. As Sheppard essentially concedes on appeal, allegations of wrongdoing pertaining to these advice letters do not concern any petitioning activity by Sheppard on its own behalf or on behalf of a client.[7] The letters were not writings made before a judicial proceeding, or in connection with an issue under review by a court. (§ 425.16, subd. (e)(1), (2).) Rather, plaintiffs' allegations concerning these letters describe garden variety transactional malpractice, which typically does not trigger the protections of section 425.16. (See, e.g., *Moore v. Shaw* (2004) 116 Cal.App.4th 182, 195–197 [10 Cal.Rptr.3d 154] [attorney's conduct in drafting a termination of trust agreement was not protected activity under section 425.16].)

The second type of wrongdoing alleged in the complaint, regarding Sheppard's representation of clients in the SEC action, is more problematic. The thrust of plaintiffs' argument is that Sheppard breached a duty owed to them by serving Hillman's needs to the detriment of coclients Peregrine and

---

[7] An attorney who is sued for statements made on behalf of a client in a judicial proceeding, or in connection with an issue under review by a court, has standing to bring a motion under section 425.16. (*Jespersen v. Zubiate-Beauchamp, supra,* 114 Cal.App.4th at p. 629; see *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1116 [81 Cal.Rptr.2d 471, 969 P.2d 564] [statute does not require that protected statements be made on the speaker's own behalf].)

the Funding Entities. Investors were harmed along with these entities, plaintiffs allege, because Sheppard's stalling and stonewalling tactics delayed the progress of the SEC's investigation and lawsuit and enabled the scheme's perpetrators to solicit—and steal—more money from investors.

■ While we agree with the trial court that the essence, or gravamen, of plaintiffs' claims is that Sheppard breached duties of care and loyalty owed to them, this conclusion does not obviate the need to examine the specific acts of wrongdoing plaintiffs allege regarding Sheppard's conduct in the SEC proceeding. As the Supreme Court has explained, "[t]he anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 92 [124 Cal.Rptr.2d 530, 52 P.3d 703].) Because conduct that is alleged to be a breach of duty—e.g., in *Navellier*, the breach of contractual obligations—may also fall within the class of constitutionally protected speech or petitioning activity, a court considering a special motion to strike must examine the allegedly wrongful conduct itself, without particular heed to the form of action within which it has been framed. (*Id.* at pp. 92–93; see also *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 734–735 [3 Cal.Rptr.3d 636, 74 P.3d 737] [section 425.16 encompasses any cause of action arising from protected activity, and the statute does not categorically exempt any particular type of action].)

Plaintiffs complain of some conduct that is not in the nature of speech or petitioning activity. For example, plaintiffs submitted a declaration from law professor Stephen McG. Bundy opining that Sheppard violated ethical rules by failing to disclose potential conflicts of interest or obtain informed consent from all clients to its joint representation of Hillman, Peregrine and the Funding Entities.[8] Likewise, the entity-plaintiffs' complaint that Sheppard abandoned them by withdrawing from the representation, and then improperly failed to turn over all client documents when they were requested by the bankruptcy trustee, does not appear to target speech or petitioning activity. But plaintiffs also challenge some of Sheppard's actions in connection with the SEC suit that fall squarely in the category of petitioning activity. For example, plaintiffs complain Sheppard opposed the SEC's efforts to obtain restraining orders and to appoint a receiver. These actions necessarily involved "written or oral statement[s] . . . made before a . . . judicial proceeding" (§ 425.16, subd. (e)(1)). Plaintiffs further allege Sheppard

---

[8] Bundy also states that Sheppard wire-transferred $6 million of Hillman's assets into its own account, depleting the assets potentially available for Peregrine and the Funding Entities to use in satisfying claims.

stopped Hillman's deposition, refusing to allow him to testify further, and threatened to put Peregrine and the Funding Entities into bankruptcy if the SEC persisted in seeking Hillman's testimony. They also complain that Sheppard orchestrated the bankruptcies of the entity-plaintiffs and then, after it withdrew from their representation, selectively responded to a discovery request by withholding documents that would have been harmful to Hillman and themselves. While these acts may not have been communicative per se, they appear to constitute "conduct in furtherance of the exercise of the constitutional right of petition" (§ 425.16, subd. (e)(4)) in that they were litigation tactics the firm employed to benefit its client Hillman's position in an ongoing lawsuit. (Cf. *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1009 [113 Cal.Rptr.2d 625] [letter of complaint sent to solicit an SEC investigation was a statement in an "official proceeding" for purposes of section 425.16].)

■ Considering the variety of wrongful acts alleged, the causes of action at issue in this case are mixed in that they are based on both protected and unprotected activity. Several appellate decisions have considered whether section 425.16 applies to such mixed causes of action, and the issue is currently under review by the Supreme Court. (*Kids Against Pollution v. California Dental Association*, review granted Sept. 17, 2003, S117156.) The apparently unanimous conclusion of published appellate cases is that "where a cause of action alleges both protected and unprotected activity, the cause of action will be subject to section 425.16 unless the protected conduct is 'merely incidental' to the unprotected conduct." (*Mann v. Quality Old Time Service, Inc.*, *supra*, 120 Cal.App.4th at p. 103; see also *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1245 [29 Cal.Rptr.3d 521]; *Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188 [6 Cal.Rptr.3d 494].) As one court explained, "if the allegations of protected activity are only incidental to a cause of action based essentially on nonprotected activity, the mere mention of the protected activity does not subject the cause of action to an anti-SLAPP motion. [Citation.]" (*Scott v. Metabolife Internat., Inc.*, *supra*, 115 Cal.App.4th at p. 414.) But if the allegations concerning protected activity are more than "merely incidental" or "collateral," the cause of action is subject to a motion to strike. (See, e.g., *Mann v. Quality Old Time Service, Inc.*, *supra*, 120 Cal.App.4th at pp. 103–105; see also *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 308 [106 Cal.Rptr.2d 906] [stating "a plaintiff cannot frustrate the purposes of the SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected activity under the label of one 'cause of action' "].)

Some of the same cases that apply the "merely incidental" test to determine whether section 425.16 applies also assert "it is the principal thrust or

gravamen of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies." (*Scott v. Metabolife Internat., Inc., supra,* 115 Cal.App.4th at p. 414; *Martinez v. Metabolife Internat., Inc., supra,* 113 Cal.App.4th at p. 188.)[9] Plaintiffs rely on this formulation of the test to argue the fundamental basis or gravamen of their claims rests in Sheppard's breaches of duty and not its petitioning activity. But the fact is that some of the alleged *actions* constituting these breaches of duty involved petitioning activity the firm undertook on behalf of its client Hillman. Although the overarching thrust of plaintiffs' claims may be that Sheppard's conduct helped advance the Ponzi scheme—to their detriment—some of the specific conduct complained of involves positions the firm took in court, or in anticipation of litigation with the SEC. We cannot conclude these allegations of classic petitioning activity are merely incidental or collateral to plaintiff's claims against Sheppard. The complaint alleges plaintiffs suffered substantial losses due to Sheppard's conduct in delaying resolution of the SEC investigation and lawsuit and its legal strategies opposing early provisional relief.

These allegations of loss resulting from protected activity distinguish this case from other cases finding certain claims against lawyers were not subject to a motion to strike under section 425.16. For example, in *Jespersen v. Zubiate-Beauchamp, supra,* 114 Cal.App.4th at pages 630–632, Division Four of the Second Appellate District concluded a legal malpractice action did not arise from protected activity because the plaintiffs did not complain of any specific act of speech or petitioning by their attorneys; rather, the attorneys were sued for their negligent *failure* to act in furtherance of their clients' right of petition. Although the attorneys had filed a declaration in court admitting their malpractice, this declaration was merely evidence of their misconduct and was not the basis of the plaintiffs' claims. (*Id.* at pp. 631–632; see also *Gallimore v. State Farm Fire & Casualty Ins. Co.* (2002) 102 Cal.App.4th 1388, 1399 [126 Cal.Rptr.2d 560] [section 425.16 does not apply when defendant's protected communicative acts are merely evidence supporting plaintiff's claim and do not constitute the alleged wrongful acts themselves].) Here, in contrast, plaintiffs claim they were injured by specific communications Sheppard made in the SEC action opposing temporary restraining orders and opposing the appointment of a receiver.

Last year, the same appellate division that decided *Jespersen* concluded a breach of loyalty claim against an attorney did not arise from protected

[9] Although the *Metabolife* cases cite *City of Cotati v. Cashman, supra,* 29 Cal.4th at page 79, for this observation, the Supreme Court's opinion in *Cotati* did not articulate this test, or any other test for mixed causes of action. Rather, the court referred to the "gravamen" of the plaintiff's cause of action as a way of explaining that application of section 425.16 in the case before it depended on an analysis of the substance of the plaintiff's declaratory relief action and not on the existence of a prior lawsuit that may have "triggered" its filing. (*City of Cotati v. Cashman, supra,* 29 Cal.4th at pp. 79–80.)

activity under section 425.16. (*Benasra v. Mitchell, Silberberg & Knupp* (2004) 123 Cal.App.4th 1179 [20 Cal.Rptr.3d 621].) The plaintiffs in *Benasra* argued the defendant firm breached a duty of loyalty owed to them as current and former clients because it represented an opponent in an arbitration proceeding against them. (*Id.* at pp. 1182–1183.) Although the trial court granted a special motion to strike, concluding the suit was based on the firm's statements and writings made in or in connection with arbitration and judicial proceedings (*id.* at pp. 1183–1184), the Court of Appeal reversed (*id.* at p. 1190). In so doing, the court relied on its holding in *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017 [117 Cal.Rptr.2d 685], that an attorney's breach of the duty of loyalty occurs as soon as the attorney agrees to represent a new client with conflicting interests, and actual disclosure of client confidences during litigation is not required as a basis of this tort. (*Benasra v. Mitchell, Silberberg & Knupp, supra,* 123 Cal.App.4th at pp. 1187–1189.) Focusing on this moment when an actionable breach of the duty of loyalty occurs, the court reasoned that the *Benasra* plaintiffs' malpractice claim did not arise out of the firm's representation of an adverse party in arbitration, but rather from the earlier breach of loyalty that occurred when the law firm allied itself with the adverse party. (*Id.* at pp. 1186–1189.)

■ We question the *Benasra* decision's focus on the theoretical time that a breach of duty occurs, as opposed to the specific allegations of wrongdoing in the operative complaint. We also question the decision's exclusive focus on the issue of breach of duty. Section 425.16, subdivision (b)(1) states that the statute applies to a "cause of action" arising from a defendant's protected activity, and establishing a cause of action requires proof of causation and damages in addition to liability. Where, as here, a cause of action alleges the plaintiff was damaged by specific acts of the defendant that constitute protected activity under the statute, it defeats the letter and spirit of section 425.16 to hold it inapplicable because the liability element of the plaintiff's claim may be proven without reference to the protected activity. ■ The Legislature has commanded that section 425.16 be "construed broadly," consistent with its remedial purpose. (§ 425.16, subd. (a).) ■ Moreover, our interpretation finds support in the language of section 425.16 itself, which provides that the statute applies to a cause of action "arising from *any act*" of the defendant in furtherance of the right to petition or free speech. (§ 425.16, subd. (b)(1), italics added; cf. *City of Cotati v. Cashman, supra,* 29 Cal.4th at pp. 75–76 [relying on this language and legislative intent that the statute be construed broadly in concluding a special motion to strike does not require proof of the plaintiff's intent to chill protected speech or petitioning].)

Because we conclude both of plaintiffs' claims are based in significant part on Sheppard's protected petitioning activity in the SEC litigation, the burden shifts to plaintiffs under section 425.16 to make a prima facie showing their claims have merit.

## II. *No Likelihood of Prevailing on Claims Barred by Defenses*

 In order to establish a probability of prevailing for purposes of section 425.16, subdivision (b)(1), "the plaintiff need only have ' "stated and substantiated a legally sufficient claim." ' [Citation.] 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citation.]" (*Navellier v. Sletten, supra,* 29 Cal.4th at pp. 88–89.) The plaintiff's burden on what the Supreme Court has referred to as the "minimal merit" prong of section 425.16, subdivision (b)(1) (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 95, fn. 11) has been likened to that in opposing a motion for nonsuit or a motion for summary judgment. (*1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 584–585 [132 Cal.Rptr.2d 789].)[10] "A plaintiff is not required 'to *prove* the specified claim to the trial court'; rather, so as to not deprive the plaintiff of a jury trial, the appropriate inquiry is whether the plaintiff has stated and substantiated a legally sufficient claim. [Citation.]" (*Mann v. Quality Old Time Service, Inc., supra,* 120 Cal.App.4th at p. 105.)

 "In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. [Citation.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733]; see also *Schroeder v. Irvine City Council* (2002) 97 Cal.App.4th 174, 184 [118 Cal.Rptr.2d 330].) As with the first prong of an analysis under section 425.16, we review de novo the trial court's determination regarding the plaintiff's probability of prevailing. (*Schroeder v. Irvine City Council, supra,* 97 Cal.App.4th at p. 184; see also *1-800 Contacts, Inc. v. Steinberg, supra,* 107 Cal.App.4th at p. 585.)

---

[10] But see *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1239–1240 [132 Cal.Rptr.2d 57] (*Tuchscher*), which points out that, unlike a motion for summary judgment, a special motion to strike under section 425.16 does not impose an initial burden of production on the moving defendant. The defendant's only burden is to establish that claims against it fall within the ambit of the statute, and the defendant does not have the overall burden of showing the plaintiff cannot prevail on the claims. (*Tuchscher, supra,* 106 Cal.App.4th at p. 1239.)

 In its motion to strike and on appeal, Sheppard does not challenge plaintiffs' ability to state or support any substantive element of their claims. Rather, Sheppard contends the bankruptcy trustee lacks standing and the claims of certain plaintiffs are barred by the defenses of unclean hands and the statute of limitations. In response, plaintiffs argue their burden is simply to present a prima facie case, and they have no obligation to disprove Sheppard's affirmative defenses. But plaintiffs' one-sided focus on the sufficiency of their prima facie showing ignores the other side of the equation, i.e., that the motion should be granted if the defendant presents evidence that defeats the plaintiff's claim as a matter of law. (*Wilson v. Parker, Covert & Chidester, supra,* 28 Cal.4th at p. 821.) Generally, a defendant may defeat a cause of action by showing the plaintiff cannot establish an element of its cause of action *or* by showing there is a complete defense to the cause of action, and there is nothing in the language of section 425.16 or the case law construing it that suggests one of these avenues is closed to defendants seeking protection from a SLAPP suit. (See *Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 398–399 [13 Cal.Rptr.3d 353] [noting the anti-SLAPP statute contemplates consideration of the merits of the plaintiff's case "as well as all available defenses to it" including state law defenses such as the statute of limitations].)[11]

 However, the defendant also generally bears the burden of proving its affirmative defenses. (Evid. Code, § 500; *Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1667 [3 Cal.Rptr.3d 279].) Thus, although section 425.16 places on the plaintiff the burden of substantiating its claims, a defendant that advances an affirmative defense to such claims properly bears the burden of proof on the defense. (See, e.g., *Mann v. Old Time Quality Service, Inc., supra,* 120 Cal.App.4th at p. 109 [noting, in the context of a § 425.16 analysis, that defendants had failed to carry their burden of establishing their allegedly defamatory statements were protected under the conditional privilege of Civil Code § 47, subd. c].)

### A. *Trustee's Claims for Peregrine Are Equitably Barred*

 Sheppard argues claims by the bankruptcy trustee are barred as a matter of law because: (1) the trustee lacks standing to sue for investors'

---

[11] Several published cases have considered the validity of defenses in determining whether the plaintiff has shown a probability of prevailing in the context of section 425.16. (See, e.g., *Mann v. Old Time Quality Service, Inc., supra,* 120 Cal.App.4th at pp. 107–109 [evaluating privilege defenses]; *Traditional Cat Assn., Inc. v. Gilbreath, supra,* 118 Cal.App.4th at pp. 398–399, 404–405 [finding plaintiffs' claim barred by statute of limitations]; *Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 322–323 [126 Cal.Rptr.2d 516] [evaluating unclean hands defense]; *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 925 [120 Cal.Rptr.2d 576] [concluding a cause of action was time-barred]; see also *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc., supra,* 129 Cal.App.4th at p. 1260 [concluding one plaintiff lacked standing to pursue certain claims].)

losses, and the complaint alleges no independent injury to the bankrupt entities; and (2) the defense of unclean hands bars the trustee from asserting claims on behalf of Peregrine. Although some cases have considered the bankrupt entity's unclean hands (generally referred to in federal decisions as the in pari delicto doctrine) as an element of standing (see, e.g., *Apostolou v. Fisher* (N.D.Ill. 1995) 188 B.R. 958, 972), they are analytically distinct concepts. (See *Official Committee v. R.F. Lafferty & Co.* (3d Cir. 2001) 267 F.3d 340, 346 (*Lafferty*) ["Whether a party has standing to bring claims and whether a party's claims are barred by an equitable defense [such as in pari delicto] are two separate questions, to be addressed on their own terms"].) We therefore consider them separately.

### 1. *Standing*

A bankruptcy trustee has no standing to sue third parties on behalf of the estate's creditors, but may assert only claims held by the bankrupt entity itself. (*Caplin v. Marine Midland Grace Trust Co.* (1972) 406 U.S. 416, 428–434 [32 L.Ed.2d 195, 92 S.Ct. 1678]; *Shearson Lehman Hutton, Inc. v. Wagoner* (2d Cir. 1991) 944 F.2d 114, 118–119 (*Shearson Lehman*); see also *Stodd v. Goldberger* (1977) 73 Cal.App.3d 827, 833–834 [141 Cal.Rptr. 67].) This is true even when creditors have expressly assigned their claims to the trustee. (*Williams v. California 1st Bank* (9th Cir. 1988) 859 F.2d 664 [trustee lacked standing to pursue claims assigned by defrauded Ponzi scheme investors].) The crucial inquiry, then, is "whether in the case at hand there is any damage to the *corporation*, apart from that done to the third-party creditor noteholders." (*Shearson Lehman, supra,* 944 F.2d at pp. 118–119; see also *Lafferty, supra,* 267 F.3d at pp. 348–349; *In re Folks* (Bankr. 9th Cir. 1997) 211 B.R. 378, 385–387.)

The complaint in this case merely sets forth two causes of action against Sheppard and does not parse out which claims—and for which alleged damages—the trustee is asserting on behalf of Peregrine and the Funding Entities and which claims the individual investors are asserting. Plaintiffs have made no attempt to remedy this vagueness below or on appeal, and we can find no clear statement in their briefing that identifies the losses plaintiffs claim these corporate entities suffered, separate and apart from losses to investors, as a result of Sheppard's alleged misconduct. Keeping in mind plaintiffs' minimal burden at this stage of the proceedings, however (see *Navellier v. Sletten, supra,* 29 Cal.4th at p. 95, fn. 11), we conclude a separate claim on behalf of Peregrine and the Funding Entities is fairly implied from the complaint. Although the complaint is primarily focused on describing Sheppard's conduct in furtherance of the Ponzi scheme, and asserting that this conduct was a substantial factor in causing enormous investor losses, the complaint also alleges Sheppard " 'put the Funding Entities into bankruptcy' " to serve the conflicting goals of Hillman and, as a result, caused the

companies to lose "investment contributions" and other "assets" and to incur attorney fees and expenses and "delay damages." While hardly a model of clarity, these allegations indicate the trustee is asserting claims the corporate entities have as clients of Sheppard, and such claims belong to the entities alone.[12]

 This conclusion does not end our standing analysis, however. When it is alleged that a debtor corporation was used as a tool in perpetrating a Ponzi scheme, federal bankruptcy courts have questioned whether any injury to the corporation is "merely illusory" because it passed directly to the sole shareholders and wrongdoers. (E.g., *Lafferty, supra,* 267 F.3d at pp. 352–353; *Feltman v. Prudential Bache Securities* (S.D.Fla. 1990) 122 B.R. 466, 473–474 *(Feltman).)* The answer to this question depends upon whether the debtor's corporate form is to be respected, or conversely whether circumstances permit a piercing of the corporate veil. *(Lafferty, supra,* 267 F.3d at pp. 352–354.) For example, in a case in which it was alleged the debtor corporations were sham entities with no corporate identity apart from their sole shareholder, a bankruptcy court concluded: "As the corporations were essentially only conduits for stolen money, any injury to the debtors . . . must be substantially coterminous with the injury to the defrauded creditors. Everything [the shareholder] stole from the debtor corporations, the debtors had stolen from the creditors. Thus, any alleged injury to the debtors is as illusory as was their corporate identity." *(Feltman, supra,* 122 B.R. at pp. 473–474, fn. omitted.) Several cases have distinguished *Feltman,* however, where the complaint does not allege the debtor was a sham corporation or a mere alter ego of its shareholders. (See, e.g., *Lafferty, supra,* 267 F.3d at pp. 353–354; *In re Plaza Mortg. and Finance Corp.* (Bankr. N.D.Ga. 1995) 187 B.R. 37, 40–41; *In re Latin Inv. Corp.* (Bankr. D.D.C. 1993) 168 B.R. 1, 7.)

The complaint does not specifically describe Peregrine and the Funding Entities as "sham" or "fictional" corporations, and we are reluctant to read such allegations into the complaint, as Sheppard would have us do, given the harsh consequences that would result. Although the complaint states Fanghella and Hillman used the Funding Entities as "devices to swindle the investors" and later describes them as "mere pass-throughs for the investors to fund" PinnFund mortgage loans, it does not allege corporate formalities were ignored, or that Peregrine or the Funding Entities were mere alter egos of the perpetrators of the Ponzi scheme. According to the complaint these companies were created "and operated . . . to generate and collect investment

---

[12] The trial court remarked on a similar ambiguity in ruling on a demurrer to plaintiffs' complaint in a related action against Union Bank of California. (Upon plaintiffs' unopposed request, we take judicial notice of this order.) The court sustained a demurrer challenging the trustee's standing with leave to amend and encouraged plaintiffs to clarify which claims are being asserted by the trustee and which by investors, noting "the trustee and the individual investors cannot ultimately pursue the same claims."

dollars" for PinnFund mortgages. It is unclear from the complaint and the record whether some of the invested money was legitimately used to fund mortgages; thus, we cannot conclude at this stage of the proceedings that Peregrine and the Funding Entities were " 'created for the sole purpose of defrauding creditors.' " (*In re Latin Inv. Corp., supra,* 168 B.R. at p. 7.)

### 2. *Unclean Hands*

Having determined Sheppard's challenge to standing does not defeat the trustee's claims as a matter of law, we next consider the argument that the trustee's claims on behalf of Peregrine are barred by the equitable defense of unclean hands.[13] This issue requires us to address three questions: (1) whether Hillman and Fanghella's misconduct in running a Ponzi scheme can be imputed to the corporate entity Peregrine (see *Casey v. United States Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1143 [26 Cal.Rptr.3d 401] [application of unclean hands doctrine depends upon whether wrongdoing of officers may be imputed to the corporation]); (2) whether Peregrine's misconduct can be imputed to the bankruptcy trustee (see *Lafferty, supra,* 267 F.3d at pp. 356–357; *In re Hedged-Investments Associates, Inc.* (10th Cir. 1996) 84 F.3d 1281, 1284–1286); and (3) whether the misconduct is sufficiently related to the causes of action asserted in this case (see *Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 979 [90 Cal.Rptr.2d 743]).

The first question is not complicated. It is settled California law that "[k]nowledge of an officer of a corporation within the scope of his duties is imputed to the corporation. (*Sanders v. Magill* ([1937]) 9 Cal.2d 145, 153 [70 P.2d 159].)" (*United California Bank v. Maltzman* (1974) 44 Cal.App.3d 41, 51–52 [118 Cal.Rptr. 299].) "On the other hand, an officer's knowledge is not imputed to the corporation when he has no authority to bind the corporation relative to the fact or matter within his knowledge. [Citations.]" (*Meyer v. Glenmoor Homes, Inc.* (1966) 246 Cal.App.2d 242, 264 [54 Cal.Rptr. 786].) Nor is a corporation chargeable with the knowledge of an officer who collaborates with outsiders to defraud the corporation. (*Ibid.*; see also *F.D.I.C. v. O'Melveny & Myers* (9th Cir. 1992) 969 F.2d 744, 750 (*O'Melveny*).) The complaint alleges that Peregrine was owned entirely by Hillman and his wife and was "controlled by" Hillman. Because Hillman, one of the primary architects of the Ponzi scheme, was also the owner and sole person in control of Peregrine, his fraud is properly imputed to Peregrine. (See *Lafferty, supra,* 267 F.3d at pp. 359–360 [imputing fraudulent conduct of officers to debtor corporation they owned and controlled]; cf. *Casey v. United States Bank Nat. Assn., supra,* 127 Cal.App.4th at p. 1143 [concluding

---

[13] In this appeal, Sheppard asserts the unclean hands defense *only* against claims the trustee has brought on behalf of Peregrine. As such, we do not decide whether the defense bars the trustee's claims on behalf of the bankrupt Funding Entities.

officers' wrongful conduct could not be imputed to debtor corporation on demurrer where complaint did not allege who owned or controlled the corporation and it could not be determined whether all relevant decisionmakers of the company participated in the fraud].)

■ Our answer to the second question is also straightforward. A bankruptcy trustee succeeds to claims held by the debtor "as of the commencement" of bankruptcy. (11 U.S.C. § 541(a)(1).) Section 541 of the Bankruptcy Code thus requires that courts analyze defenses to claims asserted by a trustee as they existed at the commencement of bankruptcy, and later events (such as the ouster of a wrongdoer) may not be taken into account. (*Lafferty*, *supra*, 267 F.3d at pp. 356–357; *In re Hedged-Investments Associates, Inc.*, *supra*, 84 F.3d at p. 1285; see also *Bank of Marin v. England* (1966) 385 U.S. 99, 101 [17 L.Ed.2d 197, 87 S.Ct. 274] ["The trustee succeeds only to such rights as the bankrupt possessed; and the trustee is subject to all claims and defenses which might have been asserted against the bankrupt but for the filing of the petition"].) In the context of an unclean hands defense, this means a bankruptcy trustee stands in the shoes of the debtor and may not use his status as an innocent successor to insulate the debtor from the consequences of its wrongdoing. (*Lafferty*, *supra*, 267 F.3d at pp. 357–358; *In re Hedged-Investments Associates, Inc.*, *supra*, 84 F.3d at p. 1285; see also *Hirsch v. Arthur Andersen & Co.* (2d Cir. 1995) 72 F.3d 1085, 1094–1095 [finding trustee precluded from asserting professional malpractice claims because of the debtor's collaboration in promoting a Ponzi scheme].) Peregrine's unclean conduct—i.e., its participation in the scheme that defrauded investors of millions—must therefore be considered without regard to the trustee's succession.[14]

■ We also believe Sheppard has the better argument as to the third question. It has long been held that the misconduct asserted in an unclean hands defense must be sufficiently related to the matter currently before the court. Thus the court held in *Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 728 [39 Cal.Rptr. 64] (*Fibreboard*) that "[t]he misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants." (See also *Yu v. Signet Bank/Virginia*, *supra*, 103 Cal.App.4th at p. 323; *Kendall-Jackson Winery, Ltd. v. Superior Court*, *supra*, 76 Cal.App.4th at p. 979.) Plaintiffs argue the

---

[14] Cases cited by plaintiffs that have declined to apply the in pari delicto doctrine to claims asserted in a receivership (see, e.g., *O'Melveney*, *supra*, 969 F.2d at pp. 751–752) are distinguishable because, unlike a receiver, a bankruptcy trustee's standing is based on, and subject to the limits of, 11 U.S.C. § 541. (See *Lafferty*, *supra*, 267 F.3d at p. 358; *Apostlou v. Fisher*, *supra*, 188 B.R. at pp. 973–974.)

unclean hands defense does not apply because Peregrine's alleged misconduct "does not *directly relate* to plaintiffs' causes of action against Sheppard Mullin for its breaches of the duties of care and loyalty." This overly narrow formulation is not supported by case law. The question is whether the unclean conduct relates directly "to the *transaction* concerning which the complaint is made," i.e., to the "*subject matter* involved" (*Fibreboard*, *supra*, 227 Cal.App.2d at p. 728, italics added), and not whether it is part of the basis upon which liability is being asserted. (*Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 621 [12 Cal.Rptr.2d 741] ["the doctrine does apply 'if the inequitable conduct occurred in a transaction directly related to the matter before the court and affects the equitable relationship between the litigants' "]; see also *Kendall-Jackson Winery, Ltd. v. Superior Court*, *supra*, 76 Cal.App.4th at p. 985 ["any evidence of a plaintiff's unclean hands in relation to the transaction before the court or which affects the equitable relations between the litigants in the matter before the court should be available to enable the court to effect a fair result in the litigation"].)

In this case, Peregrine and Hillman's orchestration of the Ponzi scheme that defrauded investors is intimately related to the professional malpractice claims before the court. These claims are based entirely on the assertion that Sheppard's professional advice and tactics enabled Hillman and Peregrine to perpetuate their fraud on investors. Moreover, Peregrine's participation in the fraud affects the equities between itself and Sheppard. For Peregrine—the company plaintiffs allege was controlled by Hillman and used by him to operate the Ponzi scheme—to now complain of Sheppard's role in enabling it to commit the fraud is unfair, and it is precisely this sort of unfairness the unclean hands doctrine seeks to address. (See *Kendall-Jackson Winery, Ltd. v. Superior Court*, *supra*, 76 Cal.App.4th at p. 985 [explaining the doctrine "is an equitable rationale for refusing a plaintiff relief where principles of fairness dictate that the plaintiff should not recover, regardless of the merits of his claim"].)

We agree with Sheppard that Peregrine's claims present a classic case for the unclean hands defense. Although plaintiffs are correct that application of this defense generally rests on questions of fact (see *Kendall-Jackson Winery, Ltd. v. Superior Court*, *supra*, 76 Cal.App.4th at p. 978), this does not mean the defense can never prevail at the pleading stage or on a motion to strike. Where, as here, a plaintiff's own pleadings contain admissions that establish the basis of an unclean hands defense, the defense may be applied without a further evidentiary hearing. (See, e.g., *In re Dublin Securities, Inc.* (6th Cir. 1997) 133 F.3d 377, 380 [bankruptcy trustee's claims were barred by in pari delicto doctrine on a motion to dismiss because complaint admitted the debtor's actions were instrumental in committing a fraud on investors]; *Lafferty*, *supra*, 267 F.3d at pp. 346, 360 [affirming order that granted motion to dismiss based on in pari delicto doctrine].) Because

Sheppard established the trustee's claims on behalf of Peregrine are barred by the unclean hands doctrine, plaintiffs did not establish a likelihood of prevailing on them, and these claims should have been stricken pursuant to section 425.16, subdivision (b).

### B. *Investors' Claims Are Time-barred*

 Sheppard next argues the investors cannot establish a likelihood of prevailing for purposes of section 425.16 because their claims are barred by the statute of limitations. Both parties agree that section 340.6 provides the applicable limitations period. This statute requires that an action against an attorney for professional malpractice must be filed "within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first." (§ 340.6, subd. (a).) The four-year period is not at issue in this case; rather, the debate concerns whether the investors had sufficient knowledge more than one year before the complaint was filed to put them on inquiry notice that they had potential claims against Sheppard. (See *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110 [245 Cal.Rptr. 658, 751 P.2d 923] [statute of limitations begins to run when a plaintiff suspects or should suspect "that someone has done something wrong to [him or] her"].)

The evidence shows, and plaintiffs do not dispute, that the investors were injured by Hillman's fraudulent scheme in 2001 and also knew in 2001 that attorneys from Sheppard were representing Hillman. Plaintiffs admit they realized they were damaged by the Ponzi scheme in March 2001, when the SEC filed suit against the companies and Hillman and Fanghella. Indeed, several investors met with their current attorney within weeks after the news was reported, and it appears from the evidence that the three named investor-plaintiffs in this action filed a putative class action suit against Hillman sometime in 2001. By 2001, when the fraudulent nature of the business was exposed, press articles identified attorneys from Sheppard as representing Hillman. Sheppard also produced evidence showing at least one investor knew in the late 1990's of Sheppard's advice to Hillman about the funds. Investor Thomas Frame testified in deposition that in 1998 he believed all the Funding Entities were represented by William Manierre, an attorney he had previously worked with and whom he knew Hillman had previously used. From his discussions with Hillman, Frame knew in 1999 that Hillman was consulting with Manierre about how to find "an exemption" to the 99-investor limit of securities registration laws. Plaintiffs now claim Manierre's advice on this subject contributed to their injuries because it enabled Peregrine and the Funding Entities to operate without appropriate regulatory oversight.

The evidence produced in connection with the motion to strike also demonstrates that by the end of 2001—more than one year before March 19, 2003, when they filed this action—the investors knew or should have known about the wrongful acts by Sheppard alleged in the complaint. In April 2001, the press reported that Hillman had transferred $6 million to his attorneys at Sheppard in violation of a court order freezing his assets. Also in April 2001, Charles La Bella, the receiver appointed for PinnFund, filed an initial report documenting several of Sheppard's actions plaintiffs now point to as wrongful. In addition to describing Hillman's transfer of $6 million to Sheppard on March 26, 2001, the receiver reported that three days later "without notice to the Court, the Receiver or the other parties, Sheppard Mullin withdrew as counsel for the Funding Entities." Sheppard did not notify the court of its withdrawal until it appeared at a hearing on April 2, 2001. Later that day, according to the receiver, Sheppard gave notice that the Funding Entities had initiated an involuntary bankruptcy proceeding for PinnFund in the United States District Court for the Southern District of California. The Funding Entities then filed their own voluntary petitions for bankruptcy still later on April 2, 2001, in the Northern District of California. The receiver closed his initial report by remarking that his attention had been "diverted" by the asset transfer to Sheppard and by "Hillman's tactic of using his three Funding Entities to attempt to place PinnFund into involuntary bankruptcy, only to place the same entities into bankruptcy hours later."

The receiver's second report, from May 23, 2001, expanded on the difficulties caused by these bankruptcies and lay the blame largely at Sheppard's feet. The receiver stated that, since his appointment, he had engaged in a "significant and on going dialogue" with the defrauded investors. These investors agreed to cooperate with each other and with the receiver. They collectively expressed the view that a bankruptcy of PinnFund would not be in the best interest of investors and would not be pursued. Likewise, the receiver explained why he had independently determined it was not prudent to pursue a bankruptcy yet. Hillman's unilateral tactic of placing the companies into bankruptcy frustrated these decisions and, according to the receiver, "served to hamstring the administration of the receivership." The receiver was highly critical of Sheppard in this report, arguing the firm's actions in orchestrating the bankruptcies "stretched the limits of good faith" and "seem[ed] to be nothing short of a continuation of the original fraud on the investors." The receiver explained that the way the bankruptcies were filed enabled Hillman to remain empowered to protect his personal interests. At the same time, the necessity of working through bankruptcy made it difficult or impossible for the receiver to perform the tasks for which he was appointed and caused the receivership to incur great expense, wasting resources that otherwise would have been returned to investors and creditors.

The receiver's May 2001 report also accused Sheppard of trying to interfere with the receivership itself. First, the report noted Hillman's attorneys from Sheppard had "strongly opposed" the appointment of a receiver, and of LaBella in particular. The receiver asserted that a Sheppard attorney made materially false statements to the court in an attempt to oppose LaBella's appointment. Later, Sheppard attorneys refused to provide information the receiver requested about Hillman's assets.

Much of the conduct complained of in these reports is described in the complaint and forms the basis of plaintiffs' claims against Sheppard. Although it does not appear that the investors were served with the receiver's first two reports, their attorney was served with his "third report" (a title that would have given them notice of the existence of two prior reports). Moreover, these reports were filed in a public proceeding, and plaintiffs do not deny having notice of their contents. Indeed, the investors do not deny that they knew or should have known of Sheppard's wrongdoing more than one year before they filed suit. But they argue their claims against Sheppard are timely because they did not "discover[] facts establishing Sheppard Mullin's duty to them" until August 2002.

In May 2002, the investors reached a global settlement with the bankruptcy trustee and receiver of their claims against the corporate entities. As part of the settlement, these parties established a "litigation committee" to pursue potential claims against third parties. On May 14, 2002, the trustee sent a letter asking Sheppard to turn over all files and documents regarding the firm's representation of the Funding Entities. In response, Sheppard produced over 1,000 pages of documents to the trustee on June 14, 2002, and the trustee forwarded them to counsel for the investors on August 26, 2002. Plaintiffs claim they did not realize Sheppard owed a professional duty to them until they reviewed these documents and found that Sheppard possessed details about individual investors' financial contributions to the funds. Plaintiffs thus assert, "the investors did not learn the facts of an attorney-client relationship until they obtained" Sheppard's files.

■ Plaintiffs' attempt to cast this history as the belated discovery of an essential fact is belied by their own complaint. The complaint alleges, "Sheppard's conduct *implies* an attorney-client relationship with the investors." (Italics added.) Specifically, the complaint asserts a duty should be implied because, in light of the small number of investors, the scope of Sheppard's engagement, and the fact that "the transactions and advice devised by Sheppard were intended to and did affect the Plaintiff Investors

directly," it was reasonably foreseeable that Sheppard's actions would cause the investors injury. That Sheppard may have owed an implied duty of care to the investors based on the foreseeability of harm to them is a *legal theory*, not an essential fact necessary to establishing liability. It is well settled that the one-year limitations period of section 340.6 " 'is triggered by the client's discovery of "the facts constituting the wrongful act or omission," not by his discovery that such facts constitute professional negligence, i.e., by discovery that a particular legal theory is applicable based on the known facts. "It is irrelevant that the plaintiff is ignorant of his legal remedy or the legal theories underlying his cause of action." ' (*Worton v. Worton* (1991) 234 Cal.App.3d 1638, 1650 [286 Cal.Rptr. 410].)" (*Village Nurseries v. Greenbaum* (2002) 101 Cal.App.4th 26, 42–43 [123 Cal.Rptr.2d 555]; see also *McGee v. Weinberg* (1979) 97 Cal.App.3d 798, 803 [159 Cal.Rptr. 86] ["The statute of limitations is not tolled by belated discovery of *legal theories*, as distinguished from belated discovery of *facts*"].)

 Based on the evidence presented on the motion to strike, the investors knew or should have known all the facts alleged in the complaint concerning Sheppard's wrongful conduct more than a year before they filed their complaint on March 19, 2003. The only fact they discovered *after* March 19, 2002, is that Sheppard had in its possession 14 pages of information about individual investors' contributions to the funds. But this "fact" is ancillary to the allegations of misconduct in the complaint; it is merely evidence the investors cite to support the theory that Sheppard owed them implied duties of care and loyalty. The investors' claims against Sheppard are untimely because they had sufficient knowledge, or access to knowledge, to put them on notice in 2001 that Sheppard had done something wrong to them. (*Jolly v. Eli Lilly & Co., supra,* 44 Cal.3d at p. 1110; see also *McGee v. Weinberg, supra,* 97 Cal.App.3d at p. 803 ["The test is whether the plaintiff has information of circumstances sufficient to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his or her investigation"].) Their ignorance of specific information contained in Sheppard's files, which were not even requested until May 2002, did not toll the running of the statute. "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly v. Eli Lilly & Co., supra,* 44 Cal.3d at p. 1111.)

Finally, the investors argue Sheppard is equitably estopped from invoking the statute of limitations because it breached fiduciary duties owed to them,

"took evasive actions to stonewall and delay these proceedings,"[15] breached ethical duties to produce documents, "and continues to this day to withhold documents."

" '[Equitable estoppel] . . . comes *into play only after the limitations period has run and addresses itself to the circumstances in which a party will be estopped from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forbearing suit within the applicable limitations period. Its application is wholly independent of the limitations period itself and takes its life, not from the language of the statute, but from the equitable principle that no man will be permitted to profit from his own wrongdoing in a court of justice.' " (Battuello v. Battuello* (1998) 64 Cal.App.4th 842, 847–848 [75 Cal.Rptr.2d 548].) The general doctrine of equitable estoppel has been codified in Evidence Code section 623: "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." Thus, when a defendant's conduct has deliberately induced the plaintiff to delay filing suit, the defendant will be estopped from availing himself of this delay as a defense. (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 384 [2 Cal.Rptr.3d 655, 73 P.3d 517]; see also *Leasequip, Inc. v. Dapeer* (2002) 103 Cal.App.4th 394, 403–404 [126 Cal.Rptr.2d 782] [listing elements required to establish equitable estoppel].)

The most glaring problem with plaintiffs' argument is that plaintiffs have failed to plead the elements of equitable estoppel. The complaint does not identify any specific conduct by Sheppard that is an alleged basis for estoppel, nor does it plead facts indicating that this conduct "*actually and reasonably induced*" the investors to forbear filing suit within the limitations period. (*Lantzy v. Centex Homes, supra,* 31 Cal.4th at p. 385.) Nor, given the facts of this case, do we believe plaintiffs could amend the complaint to plead a viable estoppel claim. (See *id.* at pp. 385–388 [concluding trial court properly dismissed claims on demurrer where plaintiffs failed to plead facts that would equitably estop defendants from asserting statute of limitations defense and there appeared no reasonable possibility the deficiency could be cured by amendment].)

For example, the court held an attorney was equitably estopped from asserting a statute of limitations defense in *Leasequip, Inc. v. Dapeer, supra,*

---

[15] Plaintiffs' brief does not clarify which "proceedings" are referred to, nor does it identify any particular "evasive stonewall[ing]" or "delay[ing]" tactics Sheppard allegedly employed to cause them to delay filing suit.

103 Cal.App.4th at pages 403–405. The plaintiff, Leasequip, was prevented from filing a timely legal malpractice action against its attorney because, during the statutory period, its corporate powers were suspended. (*Id.* at p. 404.) However, Leasequip's status as a suspended corporation resulted directly from the attorney's erroneous advice that compliance with corporate formalities was not necessary and would not affect the company's legal claims. (*Ibid.*) Applying the doctrine of equitable estoppel, the Court of Appeal concluded the attorney could not claim that the statute of limitations had expired on Leasequip's claim against him when reliance upon his erroneous legal advice was the very thing that led to the statute expiring. (*Id.* at p. 405.)

The facts alleged in this case are very different. The investors have not identified any specific conduct by Sheppard that they claim induced them to delay filing suit. Plaintiffs have criticized Sheppard's litigation tactics in defending Hillman against the SEC's civil charges, but, as discussed, this information became available to the investors long before they filed this action, and plaintiffs have not explained why such tactics would have reasonably induced them to delay filing suit against Sheppard. If anything, one would expect information about Sheppard's questionable legal tactics would have caused the investors to sue Sheppard sooner rather than later. Nor does Sheppard's allegedly belated production of documents to the trustee justify application of the equitable estoppel doctrine. As plaintiffs' legal ethics expert stated in his declaration, the California Rules of Professional Conduct require a firm that withdraws from representation to release all client papers promptly *at the request of the client*. Sheppard did produce such documents promptly, sending approximately 1,000 pages of material to the bankruptcy trustee 30 days after he requested them on behalf of the firm's former clients Peregrine and the Funding Entities. Plaintiffs have not argued, nor is there evidence to show, that they made any prior unsuccessful request for these files. Finally, an estoppel cannot be based on a plaintiff's bare assertion that the defendant is continuing to withhold relevant documents in its possession, or else statutes of limitations would be eviscerated in every case involving a discovery dispute. Moreover, it is not apparent—and plaintiffs have not explained—how any improper withholding of documents by Sheppard in its June 2002 production actually and reasonably induced the investors to delay filing suit. (See *Lantzy v. Centex Homes, supra,* 31 Cal.4th at p. 385.)

Accordingly, the investors' claims are barred by section 340.6, and plaintiffs did not establish a likelihood of prevailing on these claims for purposes of the motion to strike.

## DISPOSITION

The order denying Sheppard's special motion to strike is reversed in part. On remand, the trial court is directed to enter an order granting the motion to strike as to all claims asserted by the investor-plaintiffs and all claims asserted by the bankruptcy trustee on behalf of Peregrine. The order denying Sheppard's motion to strike is affirmed as to the remaining claims, which are those asserted by the bankruptcy trustee on behalf of the Funding Entities. Each side shall bear its own costs on appeal.

Corrigan, J., and Parrilli, J., concurred.

On November 10, 2005, the opinion was modified to read as printed above.