[Civ. No. 9915.   First Appellate District, Division One.—October 29, 1936.]

WEST AMERICAN FINANCE COMPANY (a Corporation), Appellant, v. PACIFIC INDEMNITY COMPANY (a Corporation), Respondent.

Courtney L. Moore for Appellant.

Redman, Alexander & Bacon and A. B. Weiler for Respondent.

KNIGHT, J.—This is one of three actions brought by the appellant, West American Finance Company, a corporation, against the respondent, Pacific Indemnity Company, a corporation, to recover from the latter the total sum of $90,000 claimed to be due under three successive fidelity bonds issued by the indemnity company insuring the finance company against loss from dishonest acts of its officers, clerks, and employees. The complaint in the first action was filed on

September 15, 1931, and a demurrer thereto was sustained. On May 18, 1932, an amended complaint was filed, and at the same time complaints in the second and third actions were filed. Demurrers were interposed to each, and those demurrers also were sustained. On September 6, 1934, amended complaints were filed in all three actions, and on March 12, 1935, demurrers thereto were sustained without leave to amend, following which judgments were entered in favor of the indemnity company, and the finance company has taken an appeal from each judgment. The three appeals are presented in separate records, and are numbered respectively Civil Nos. 9915, 9914, and 9913; but all involve the same fundamental questions and therefore may be disposed of in one opinion.

The first action (appeal No. 9915) was based on a bond applied for prior to and issued on March 28, 1928. The insurance thereunder covered a period of between April 8, 1928, and April 8, 1929, and according to the allegations of the complaint guaranteed against loss by "larceny, embezzlement, theft or any other fraudulent or dishonest act, wrongful abstraction or wilful misapplication, committed by the president, treasurer, or active assistant treasurer at Los Angeles . . . occasioned by the act" of such officers or through their connivance with others. The maximum amount of the indemnity was $25,000 for dishonest acts of the president, $25,000 for like acts of the treasurer, and $10,000 for those of the assistant treasurer at Los Angeles.

The second action (appeal No. 9914) was based on a bond issued on April 8, 1929. By its terms it continued in force until September 15, 1930, and called for a maximum indemnity of $20,000 against loss, so the complaint alleges, sustained "by reason of any dishonest act of any of the officers or employees" of the finance company during the existence of the bond.

The third action (appeal No. 9913) was based on a bond issued on or about September 15, 1930, which ran for a year, and the complaint alleges that it indemnified the finance company to the extent of $10,000 against loss "through any dishonest act wherever committed, of any employee, which term was designated to include all officers, clerks and other persons in the immediate employ of the insured".

It appears generally from the allegations of the complaints that on March 12, 1928, which was prior to the issuance of any of said bonds, the president and the treasurer of the finance company, namely, R. T. Harper and J. C. Hadley, and two others, namely, J. E. Scully and J. A. Sinclair, constituted the four majority members of the board of directors of the finance company; and these four owned all the stock of a corporation known as the First Mortgage Bond Company. The latter corporation in turn owned a majority of the stock in several interlocking corporations including the appellant company. That is to say, the First Mortgage Bond Company, which was owned by the four majority members of the board of directors of the finance company, owned the majority of the stock of the California Securities Company; the California Securities Company in turn owned a majority of the stock of the Empire Finance Corporation, and the Empire Finance Corporation in turn owned a majority of the voting stock of the appellant finance company. Therefore, by reason of their ownership of all of the stock in the First Mortgage Bond Company the four individuals named controlled the management, policies and affairs of all of said corporations. It further appears from the allegations of the complaints that prior to and at the time of the application for and issuance of the three successive bonds here sued upon, said four majority members of the board of directors of the finance company, acting under corporate authority as such, had been and they were then actually engaged in carrying on certain business transactions with the interlocking corporations and with themselves and others, which resulted in large financial losses to the finance company, and which are now claimed to have been fraudulent; also that acting under the same authority said directors appropriated certain sums of money to different purposes which are now claimed to be dishonest. No disclosures whatever were ever made by anyone to the indemnity company prior to or at the time of the issuance of any of the bonds, nor during the period of duration thereof, of the manner in which the insured company was being dominated and controlled by said four directors as the result of their ownership of the stock voting power in the interlocking corporations. Nor were any disclosures ever made to the insurer

of any of the practices which were being carried on by the four directors constituting the majority of the board of the insured company and which practices are now claimed to have been fraudulent. Nor did the indemnity company have any knowledge whatever of such practices until demand was made upon it by the insured company to make good the losses brought about thereby. In other words, it appears from the face of the complaints that while the majority of the board of directors of the insured company were as such directors engaged in carrying on and receiving the benefits of the practices which are now claimed to be fraudulent, they were taking out these indemnity bonds insuring their own fidelity.

The demurrer to each complaint was based on some eighteen general and special grounds, and the first important disputed question presented is whether the specific transactions complained of, which resulted in the losses the insured company is now seeking to recoup from the bonding company, fell within the scope of the insuring clauses of said bonds. As alleged in the three complaints these transactions in substance were as follows:

(a) On March 12, 1928, which was immediately prior to the writing of the fidelity insurance, these four directors thus controlling, through the medium of their four successively controlled corporations, the finance company, caused the latter to enter into a contract appointing the First Mortgage Bond Company its sole and exclusive broker for the handling of all of the funds of the finance company, thereby giving to the First Mortgage Bond Company the exclusive right to negotiate and procure mortgage loans for the finance company, and giving it first call on all of the funds of the finance company available for investment. The agreement further provided that as compensation for its services in loaning the funds of the finance company, the First Mortgage Bond Company should receive a sum equal to one-half of any brokerage which might be collected from borrowers and in addition should receive all commissions on insurance in connection with said loans. As a result of this contract the First Mortgage Bond Company received during the period of the first bond sued upon the sum of $76,971.43, which amount was divided among said directors. On February 5, 1929, Harper re-

signed as president of the finance company, and he was succeeded by M. A. Strang; and between the date of his resignation and April 8, 1929, the finance company, pursuant to the terms of the agreement of March 12, 1928, paid to the First Mortgage Bond Company the additional sum of $1300.

(b) On March 23, 1928, and immediately prior thereto, L. E. and W. A. Moses were two of the other directors of the finance company. They had a relative named A. C. Moses, who, with another person, both of whom were without funds, owned a leasehold on a silica deposit in Nevada, which was subject to a lien for $55,000. The property had never been operated and had never produced any revenue, and before it could be operated required the expenditure of large sums of money for the purchase and installation of machinery and for development work. On the date above mentioned, L. E. and W. A. Moses, with three of the four directors who owned the First Mortgage Bond Company, knowing the speculative character of the venture and without obtaining any sound security, caused the appellant company to finance the enterprise to the extent of $65,700. The venture was a complete failure, and the finance company suffered a total loss of the entire amount of money so advanced.

(c) On December 17, 1928, the finance company, likewise through these same four directors, loaned to the California Securities Company, which as stated was controlled by them, the sum of $13,000 at a time when the California Securities Company was known to be insolvent. Also (d) on December 17, 1928, as the result of connivance between Harper and the other three majority directors, the finance company accepted the obligation of the California Securities Company for $20,000 in liquidation of a mortgage for that amount which the finance company held on property belonging to Harper, thereby releasing Harper's property from the lien of the mortgage. Both the loan of $13,000 to the California Securities Company and its obligation of $20,000 to the finance company were complete losses to the finance company.

(e) In December, 1928, it appeared likely that the four directors might lose control of the finance company to the preferred and class A stockholders of the Empire Finance

Corporation, which as stated was the controlling stockholder of the finance company; whereupon these four directors, conniving with certain outsiders, entered into and carried out a scheme to acquire fifty-one per cent of the class A and preferred stock of the Empire Finance Corporation. In carrying out this scheme they caused the finance company to advance $75,000 which was used to purchase stock of the Empire Finance Corporation; and this $75,000 was subsequently repaid to the finance company by delivering to it forty-three second mortgages, many of which were "sour", and the net result to the finance company was a loss of $25,000.

(f) On or about March 28, 1928, Harper and Scully entered into a scheme to profit by the use of the finance company's funds in building an apartment house. They were aided and assisted by Sinclair and Hadley, the other two directors. Scully purchased the land, and the four directors caused the finance company to advance to Harper and Scully under the guise of a loan to Scully's sister, Josephine, the total sum of $390,000. The venture proved a losing one, and to escape their obligation to the finance company Scully and Harper caused the finance company to accept a deed to the apartment house and to cancel Harper's and Scully's obligations to the finance company. As a result of this transaction the finance company suffered a loss of $130,000.

(Appeal No. 9914.) On or about February 5, 1929, Harper disposed of his stock in the First Mortgage Bond Company, and C. A. Gibson became a director and officer therein, and in the California Securities, the Empire Finance and the West American Finance Companies. Therefore, from and after that date and until September 15, 1930, Gibson, Hadley, Scully and Sinclair, by reason of their control of the capital stock in the First Mortgage Bond Company, controlled also the management, policies and affairs of the interlocking corporations, including the appellant company.

(a) On December 31, 1929, the finance company had overpaid the First Mortgage Bond Company $37,644.18; that is, the First Mortgage Bond Company owed that amount to the finance company on account of moneys due the latter under the contract of March 12, 1928, and for advances made by the finance company to the First Mort-

gage Bond Company; and said four directors of the finance company, in order to make it appear that the First Mortgage Bond Company had paid its obligation in full, caused the First Mortgage Bond Company to purchase 400 shares of preferred and 1800 shares of class A stock of the finance company for the sum of $4,835.28, and the finance company to purchase 2,100 shares of its own preferred stock for $7,350.97. Then by false book entries it was made to appear that the finance company had loaned this $7,350.97 to the First Mortgage Bond Company, and that the First Mortgage Bond Company had made the purchase of the 2,100 shares of stock. Thereupon they caused the First Mortgage Bond Company to purport to sell these two blocks of stock to the finance company for $34,400. In other words, they caused the First Mortgage Bond Company to purchase stock for $12,186.25, of which $7,350.97 was advanced by the finance company, and then caused the First Mortgage Bond Company to purport to sell to the finance company for $34,400 the same stock which had actually cost $12,186.25; and thus it was made to appear that a large portion of the debt owed by the First Mortgage Bond Company to the finance company had been liquidated. These overpayments to the First Mortgage Bond Company thus liquidated had theretofore been distributed by it to the four directors.

(b) About November 1, 1929, Scully, Sinclair, Hadley, Gibson, Neil I. Ross, and T. Alan Ross were in control of a corporation known as the Consolidated National Securities Company; and Gibson, Ross and Ross were also interested in the Inland Finance Company, which was insolvent. Gibson, Ross and Ross, together with four directors who constituted the First Mortgage Bond Company, caused the finance company to purchase stock of the Inland Finance Company for $34,792, at a time when they knew that the stock was worthless, and afterwards to sell said stock to the Consolidated National Securities Company, which also was in a failing condition. In payment of the stock the Consolidated gave the finance company its promissory note secured by second mortgages, which at the time were not worth more than $10,000. The result was that the finance company suffered a loss of $24,792.

(Appeal No. 9913.) (a) Between September 15, 1930, and March 18, 1931, Gibson, Hadley, Sinclair, Scully, Ross and Ross continued in control of the management of the finance company and the Consolidated National Securities Company, and as directors of the finance company they entered into an arrangement with the Consolidated National Securities Company, which, as stated, was insolvent, to collect obligations due and owing to the finance company. The Consolidated collected $2,641.57, and then by false book entries the finance company made it appear that it had loaned this amount to the Consolidated National Securities Company. The amount of the collections was therefore a total loss to the finance company. (b) Between September 15, 1930, and December 20, 1930, the directors of the finance company used $410 of the company's funds for the purpose of incorporating the Western Capital Company, in which some of its directors were interested. (c) In January, 1931, said directors used $6,000 of the finance company's funds in the defense of a personal action brought against them by certain stockholders wherein the directors were charged with misappropriations of the company's funds. (d) And in March, 1931, in a stockholders' proxy fight, said directors used the company's funds to purchase shares of its own stock and paid therefor $6,827.62 in excess of the market value of the stock so purchased.

Nowhere in any of the complaints was it alleged directly or inferentially that the minority stockholders or the creditors of appellant company were not aware of the situation existing in said corporation as to its domination and control by said four directors, or of the particular transactions which said directors were engaged in carrying on, as set forth in the three complaints. ■ Respondent contends, therefore, that in the absence of such allegations it must be presumed that all parties interested in the appellant company not only acquiesced in but also approved of said transactions, and that such being the case the corporation is now precluded from asserting as against the respondent that said transactions were fraudulent. It is unnecessary to inquire into this point, however, for the reason that so far as we are here concerned it may be assumed, as appellant contends, that all of said transactions were fraudulent, and still under well-settled rules

of law the insuring clauses of the bonds were unenforceable against the surety because of the nondisclosure to the surety of fraudulent practices which at the time the successive bonds were applied for and issued, were being carried on under the name of the corporation and in the exercise of its corporate powers.

In this regard it may be said to be a fundamental principle of the law of fidelity guaranty that if dishonesty of an agent, whose fidelity is guaranteed under a bond, exists before or at the time the surety on the bond becomes bound thereby, and the principal conceals it from the surety at the time of obtaining the fidelity bond, the surety is not liable for the losses resulting therefrom; furthermore, that where there is a continuing guaranty for the fidelity of an agent and the principal discovers that the agent has been guilty of dishonesty in the course of his services and he continues him in the service without revealing such dishonesty to the guarantor on the fidelity bond, the principal cannot afterwards have recourse to the guarantor to make good any losses which may arise from the dishonest acts of such person during the subsequent service. (*Roberts* v. *Donovan*, 70 Cal. 108 [9 Pac. 180, 11 Pac. 599].) Furthermore, as held in *American National Bank* v. *Donnellan*, 170 Cal. 9 [148 Pac. 188, Ann. Cas. 1917C, 744], the mere nondisclosure of the circumstances affecting the situation of the parties which are material for the surety to be acquainted with and are within the knowledge of the person obtaining the surety bond, is undue concealment even though not wilful or intentional or with a view to any advantage to himself.

Manifestly, therefore, in the present case, the nondisclosure of the fraudulent practices which were being carried on by the majority members of the board of directors under their corporate powers at the time of the application for the issuance of these successive fidelity bonds, and which resulted in the enormous losses the corporation now seeks to compel the surety to make good, constituted concealment from the surety of the material facts upon which it was clearly entitled to be informed before it could intelligently decide whether under the existing conditions it would assume the risk to be imposed upon it by the fidelity bonds. In fact, it would appear

from the allegations of the complaints that such conceal-ment was not unintentional. Respondent in its brief puts it this way, that "the stage was set for the making of the very claims" now sued upon. And appellant in its brief chooses to sum up the situation as follows: "A small group of men functioning under a corporate screen had by the acquisition of voting stock control of successive corpora-tions finally acquired control of the management of a finan-cial institution of large assets, whereupon by various de-vices they proceeded to use these assets in private ventures for the personal enrichment of the directors and officers. If these private ventures turned out to be unprofitable they were immediately turned back to the West American Finance Company, thereby relieving the officers and directors of the obligations and thereby causing the West American Finance Company to shoulder the losses." And to the foregoing may be added that while this group of men were thus proceeding to fasten these losses on the corporation's shoulders they were at the same time, as the governing board of directors of the corporation, obtaining from re-spondent fidelity bonds insuring their own honesty for the very purpose of placing the corporation, and incidentally themselves as the owners of the majority of the vote con-trolling stock therein, in a position to recoup from the surety the losses which they were bringing about by their own wrongful acts.

Appellant contends, however, that where an agent is perpetrating a fraud against or otherwise acting ad-versely to his principal, the agent is then acting beyond the scope of his authority, and any knowledge acquired by him of his own fraudulent acts is not imputed to his principal; that it follows, therefore, that where, as here, the officers of a corporation carry on fraudulent operations against the corporation their knowledge of their own fraudu-lent acts is not imputed to the corporation so as to void a fidelity bond insuring their honesty.

The rule in this respect is stated by the Supreme Court in the case of *McKenney* v. *Ellsworth*, 165 Cal. 326, 329 [132 Pac. 75], as follows: " . . . Where an agent of a corporation is dealing with the corporation in a transaction in his own behalf, it will not be presumed that he will communicate to his principal facts affecting the trans-

action. (*Commercial Bank* v. *Burgwyn,* 110 N. C. 267 [17
L. R. A. 326, 14 S. E. 623]; *McDonald* v. *Randall,* 139 Cal.
246 [72 Pac. 997].) This is no doubt the general rule
regarding the imputing to a principal of notice of facts
known to an agent who is, in the particular transaction
in question, acting in an interest adverse to that of his prin-
cipal. But,'' continues the court, ''the rule is not without
exceptions. If the agent is in fact acting for his principal
in the transaction, even though he may have an opposing per-
sonal interest, 'it is his duty, notwithstanding his interest, to
communicate to his company (principal) any facts in his
possession, material to the transaction, and the law will
therefore presume, in favor of third persons, that he made
such communication'. (*Bank of Pittsburg* v. *Whitehead,* 36
Am. Dec. 186, note; *Le Duc* v. *Moore,* 111 N. C. 516 [15
S. E. 888].)'' The exception above noted is restated in
California Jurisprudence (vol. 6A, pp. 1169, 1170, sec. 665)
as follows: The rule that knowledge of an officer acquired
in the course of his duties is presumed to have been com-
municated to the corporation is subject to the exception that
where his dealings were with the corporation in a trans-
action in his own behalf, it will not be presumed, as a gen-
eral rule, that he communicated to the corporation facts
affecting the transaction. This exception is itself subject
to an exception, however. If the officer is in fact acting
for the corporation in the transaction, even though he may
have an opposing personal interest, it is his duty, notwith-
standing his interest, to communicate to his company any
facts in his possession material to the transaction. In such
case the law will presume in favor of third persons that he
made such communication; and it is immaterial that he
took some personal benefit from the fraud. (To the same
effect see 1 Cal. Jur. 852; *Williams* v. *Hasshagen,* 166 Cal.
386 [137 Pac. 9]; *State Savings etc. Bank* v. *Winchester,*
25 Cal. App. 691 [145 Pac. 171].) We are convinced that
the facts of the present case, as they are set forth in the
complaints, bring it clearly within the scope of the fore-
going exception, and that therefore the knowledge of the
majority members of said board of directors of their own
fraudulent transactions was imputed to the corporation
itself, even though said majority members were beneficially

interested in the frauds so consummated, to the detriment of the corporation.

■ Appellant calls attention to certain allegations of the complaints to the effect that the bonds were negotiated by an employee having charge of its insurance department who was ignorant of any of the fraudulent practices which were being carried on. But obviously such ignorance on his part is entirely immaterial so far as concerns the question of the enforceability of the bonds for the simple reason that it was the corporation itself and not the employee who was making application for the bonds; the corporation itself and not the employee became the other party to the contract of guaranty and was named as the insured therein; and all of the benefits of the contract inured exclusively to the corporation.

It is our conclusion, therefore, that upon the grounds above discussed the trial court was justified in sustaining the demurrers to the complaints without leave to amend.

The judgment herein is affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 28, 1936, and said petition for hearing was stricken from the files because of the inclusion of language defamatory of the Justices of the District Court of Appeal.