**In re CALIFORNIA TD INVESTMENTS LLC, Golden State TD Investments, LLC, Debtor(s).**

**Golden State TD Investments, LLC, QHL, Holdings, Fund Ten, LLC, Marc Sobel, Ruth Ann Wundermann–Cooper, Plaintiff(s),**

**v.**

**Andrews Kurth LLP, Jon L. Dalberg, Michael D. Jewesson, Defendant(s).**

**Bankruptcy No. 1:07–bk–13003–GM. Adversary No. 1:09–ap–01405–GM.**

United States Bankruptcy Court, C.D. California.

March 6, 2013.

Jay H. Robinson, Marron Robinson Frederick & Foster, Dennis P. DeFranzo, Burbank, CA, Corey R. Weber, Robyn B. Sokol, Ezra Brutzkus Gubner LLP, Woodland Hills, CA, for Plaintiffs.

Craig Millet, Irvine, CA, Michael B. Smith, Gibson, Dunn & Crutcher LLP, Palo Alto, CA, Kevin S. Rosen, Gibson, Dunn & Crutcher LLP, Samuel A. Newman, Los Angeles, CA, for Defendants.

## REDACTED MEMORANDUM OF OPINION REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOCKET NUMBER 62]

GERALDINE MUND, Bankruptcy Judge.

Defendants Andrews Kurth LLP, Michael D. Jewesson & Jon L. Dalberg ("Defendants") bring this motion for summary judgment ("MSJ") on grounds of *in pari delicto*.

### Background

Although the parties have a filed a significant amount of paper disputing what are "uncontroverted facts", most of the essential factual background for this motion is not in dispute:

Quality Home Loans, Inc. ("QHL") was formed in 2001 by John and Kitty Gaiser (the "Gaisers"), who each owned 50% of QHL. Its business was originating, servicing, buying and selling sub-prime mortgages.

To fund its business, QHL formed the plaintiffs in this adversary proceeding, QHL Holdings, Fund Ten, LLC ("Fund Ten") and Golden State T.D. Investments, LLC ("Golden State" and, with Fund Ten, the "Funds"). QHL was the initial Member and initial Manager of each Fund. *See* Amended and Restated Operating Agreement of Fund Ten dated 5/3/05 and Amended and Restated Operating Agreement of Golden State dated 3/31/05 (the "Operating Agreements"), which are Defendants' Exhibits A & B and Plaintiffs"

Exhibits 1 & 2, at ¶¶ 3.1, 5.1.[1] Additional members could be added at a price of $1000 per share. *Id.* at ¶ 3.2. There were approximately $37 million worth of additional memberships purchased in Fund Ten and $20 million in Golden State. The Gaisers ultimately held less than 20% of the member shares in either Fund. Declaration of Randy Miller in Support of Plaintiff's Opposition to MSJ at ¶ 7.

The Funds' stated purposes were "to acquire, hold and liquidate promissory notes secured by deeds of trust and mortgages to real property in the United States of America, and to distribute to the Members the Available Cash therefrom." Operating Agreements ¶ 2.4 (the "liquidate" purpose was only in Golden State's Operating Agreement.)

The Funds had no employees and were managed by QHL (which remained the only manager of each Fund through the events described herein) under the terms of Operating Agreements. The Operating Agreements gave QHL, as manager, authority to "manage and direct" the Funds (¶ 5.3), but required approval of a majority of member shares before the manager could act with respect to:

(a) the sale, lease, exchange, mortgage, pledge or other disposition of all or substantially all of the Company's assets;

(b) the Company's merger with or conversion into another entity;

(c) [undertaking involving a debt or obligation which would, when taken with all other obligations of the Company, exceed one half of the face value of all notes held by the Company]; and

(d) a transaction, not expressly permitted by this Agreement, involving a

conflict of interest between the Manager and the Company, provided however that the sale to the company of mortgage loans originated by the Manager shall not be deemed a conflict of interest.
Operating Agreements ¶ 5.4 (provision C in brackets is only in Fund Ten's Operating Agreement).

In May and June of 2007 QHL and the Funds entered into three separate transactions: one with Silar Advisors, L.P., one with Pacificor, LLC and one with Bayview Financial, LP (the "Transactions"). Andrews Kurth was special counsel to QHL and the Funds (as well as another related entity) in the Transactions and issued opinions that were conditions to closing in each Transaction.

The particulars of these Transactions are not clear from the papers and the harm to the Funds arising from these transactions is a disputed fact that is the crux of this MSJ. Plaintiffs have presented some evidence that the Transactions sold, pledged or otherwise put the assets of the Funds at risk, in transactions that benefitted QHL, but not the Funds. In early 2007, QHL was experiencing cash flow difficulties and was trying to "shore up" with the Silar Transaction and possibly the Pacificor transaction. Miller Dec. at ¶ 9; 5/17/07 e-mail of Michael Jewesson, which is Plaintiffs' Exhibit 10. The Funds were not experiencing cash flow difficulties, at least through March 2009. Miller Dec. at ¶ 9. The Pacificor Transaction gave Pacificor the right to pursue remedies against QHL and the Funds upon default by any of them. See Draft Repurchase Agreement with accompanying e-mails, which is Plaintiff's Exhibit 7; Notice of Motion and Motion of Pacificor, LLC for Order Con-

---

1. Defendants' Exhibits are attached to the Declaration of Joshua Jessen in support of the MSJ. Plaintiffs' Exhibits are attached to the

Declaration of Dennis DeFranzo in support of Opposition.

firming Applicability of 11 U.S.C. § 555 (filed 11/21/07 in Case No. 07:13003–GM), which is Plaintiff's Exhibit 8, at 1–3. The UCC Financing Statements annexed to the Andrews Kurth opinion respecting the Pacificor Transaction lists QHL collateral of $401,949.35, Golden State collateral of $20,420,214.67 and Fund Ten collateral of $12,164,385.93. Plaintiffs' Exhibit 5. In November of 2007, Pacificor sought permission to exercise its remedies against the Funds. Pacificor § 555 Motion (Plaintiffs' Exhibit 8). The Funds and QHL received over $45 million from the Pacificor Transaction. *Id.* Under the Funds' Operating Agreements, QHL, not the Funds, received all earnings over the 12% annual distributions made to Fund members. Operating Agreements at ¶¶ 4.4(a) & 5.7; Miller Dec. at ¶ 8. Thus, any increased cash flows from these transactions would accrue to the benefit of QHL, while the Funds subjected their assets to risk.

On 8/21/07 QHL and the Funds filed for chapter 11 relief.

On 8/14/09, the Funds commenced an action against the Defendants in Los Angeles Superior Court (# BC419791), which was removed to this court and became this adversary proceeding. In this proceeding, Plaintiffs allege that the Transactions damaged the Funds and would not have occurred without the opinion of Andrews Kurth. (The individually named defendants are Andrews Kurth attorneys who worked on the Pacificor transaction.) Plaintiffs assert claims against the Defendants for malpractice and breach of fiduciary duty. In essence, their claims allege (i) Andrews Kurth had a conflict of interest representing both QHL and the Funds and (ii) the Andrews Kurth opinion did not accurately reflect the terms of the Operating Agreements.

[REDACTED] The Bonds indemnified the Funds for, among other things, "Loss resulting solely and directly from one or more dishonest or fraudulent acts by an employee...." Complaint dated 4/15/10 commencing the Bond Action ¶ 9 (Defendants' Exhibit F).

### The Motion and its Responses

#### Motion

Defendants have brought this MSJ on grounds of *in pari delicto:* that the Funds engaged in misconduct directly related to Defendants' alleged wrongdoing. In essence, they argue that the Funds admit to QHL's wrongdoing and QHL's misconduct should be imputed to the Funds (i) under principles of corporation and agency law and (ii) as a matter of judicial estoppel.

Defendants first allege *that the Funds have admitted* a laundry list of wrongdoing by Gaiser and QHL including falsifying documents, having the Funds make investments in worthless assets and assets that were not authorized under the Funds' Operating Agreements, theft of money from the Funds by QHL and amendment of the Funds' operating documents without the requisite member consent. The three 2007 Transactions were merely a continuation of this same fraudulent and dishonest scheme.

Defendants argue two grounds for imputing QHL's misconduct to the Funds. One, QHL's acts should be imputed to the Funds under principles of corporation and agency law that impute wrongful conduct of a corporate officer to a corporation that is wholly-controlled by that officer. Two, the Funds admitted in their Bond Action against Lloyd's that John Gaiser and other QHL employees were employees of the Funds when they committed their wrongful and fraudulent acts, so that judicial estoppel bars the Funds from denying that such employees acted for the Funds.

Under either of these imputation theories, QHL's misconduct must be directly

related to Defendants' alleged wrongdoing at issue in this proceeding, and Defendants argue that it is.

*Opposition*

Plaintiffs' opposition to the MSJ initially argues their underlying case for breach of fiduciary duty by Defendants, which is not relevant to this MSJ.

The Funds next argue that QHL's misconduct should not be imputed to the Funds. Applicable law will not impute corporate officer wrongdoing to a corporation if the officer was acting against the interests of the corporation, as here. The "sole actor exception," which would impute liability notwithstanding such an adverse interest, should not be applied because QHL is not sole owner of the Funds and QHL was not the sole party with control over the Funds. The Funds also argue imputation is inappropriate against LLCs (as opposed to corporations) or as a shield to benefit wrongdoers such as the Defendants.

The Funds argue that their "admissions" in the Bond Action that QHL employees were employees of the Funds was in the limited context of their lawsuit against Lloyd's and should not be used to invoke judicial estoppel.

*Reply*

Defendants argue that any conflict of interest on the part of Andrews Kurth, as well as the fact that the Funds are LLCs and not corporations, are irrelevant to this MSJ.

They reassert that *in pari delicto* should be applied to this situation where wrongdoer Gaiser controlled the Funds through QHL and cite a "phalanx" of cases for this proposition. Defendants argue that the adverse interest exception should not apply because it requires the agent to "totally abandon" or be "entirely adverse" to the principal's interest. Furthermore, Plain-

tiff's have not presented admissible evidence of any such "adverse interest" and to the extent the money went to QHL, it benefited the Funds by providing them with management.

Finally, Defendants argue that Plaintiffs cannot admit that QHL employees are employees of the Funds for one purpose in the Bond Action, but not another in this proceeding.

### Legal Analysis

The central issue in this MSJ is whether misconduct of QHL and its directors, officers and employees can be imputed to the Funds where the Funds had no employees, but, pursuant to their Operating Agreements, were managed by QHL, as the sole manager.

*Corporation/Agency Law*

■ California follows the well-established principle that the acts and knowledge of an officer/agent can be attributed to a corporation/principal. Imputation may be appropriate even though the Funds are LLCs rather than corporations and QHL is a manager rather than the officer. Courts do not differentiate LLCs from more traditional corporations in this context. *See, e.g., Elder v. Greer (In re Sand Hill Capital Partners III, LLC),* 2010 WL 4269622, 2, 2010 Bankr.LEXIS 3785, 6 (Bankr.N.D.Cal. Oct. 22, 2010); *546–552 W. 146th St. LLC v. Arfa,* 54 A.D.3d 543, 863 N.Y.S.2d 412, 415 (1st Dep't 2008). Furthermore, imputation of officer acts to the corporation is simply an application of more general agency law.

■ This attribution or imputation rule is subject to the "adverse interest" exception, which is in turn subject to the "sole actor" exception:

California courts have recognized a limited exception to the rule that the acts of an officer acting adversely to a company will not be attributed to it. In *Pereg-*

*rine,* the court imputed the fraudulent conduct of an officer and sole-shareholder to the corporation in spite of the fact that his actions were adverse to it. 133 Cal.App.4th at 679, 35 Cal.Rptr.3d 31. The court reasoned that because the perpetrator of the fraud "was also the owner and sole person in control of [the corporation], his fraud is properly imputed to [the corporation]." *Id.* Courts have declined to impute this exception, however, where it has not been established that all relevant decision makers for the corporation were engaged in the fraud. See *Casey v. U.S. Bank Nat'l Ass'n,* 127 Cal.App.4th 1138, 1143, 26 Cal.Rptr.3d 401 (Cal.Ct.App.2005). Thus, finding that a corporation is barred from recovery on the basis of unclean hands is appropriate at the summary judgment stage only if the undisputed evidence meets the standard set forth in *Peregrine,* namely, that those who perpetrated the fraud solely control the corporation.

*McHale v. Silicon Valley Law Group,* 2011 WL 6990187, 5–6, 2011 U.S. Dist. LEXIS 151680, 17–18 (N.D.Cal. Dec. 14, 2011); *see also Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP,* 133 Cal. App.4th 658, 679–680, 35 Cal.Rptr.3d 31 (Cal.Ct.App. 1st Dist.2005); *see generally Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 358–359 (3d Cir.2001) (under Pennsylvania law); *USACM Liquidating Trust v. Deloitte &*

*Touche, LLP,* 764 F.Supp.2d 1210, 1222 (D.Nev.2011)(under Nevada law).

■ While New York courts have required that the agent has "totally abandoned" the principal's interests and other courts have required "total" or "complete" adversity for the "adverse interest" exception to apply (see numerous authorities cited by Defendants in Reply at 9), California courts and the Ninth Circuit do not appear to require this heightened standard of self-dealing. *See, e.g., O'Melveny,* 969 F.2d at 750 ("there can be no attribution, and therefore no estoppel, when the insiders, rather than the corporation, benefit from the wrongdoing"); *McHale,* 2011 WL 6990187 at 5–6, 2011 U.S. Dist. LEXIS 151680 at 17 ("officer is engaged in an activity that is adverse to the interest of the corporation").[2] Thus, Plaintiffs' need establish only that QHL acted "adversely" to the Funds.[3]

Defendants' argument that there is no evidence that QHL acted adversely to the Funds flies in the face of facts that Defendants rely on to initially establish QHL wrongdoing that should be imputed to the Funds. Defendants rely on this statement from the complaint: "It is abundantly clear from the Proof of Loss that John Gaiser, via the vehicle of his alter ego, QHL, recklessly and wantonly engaged in activities that directly caused the Funds, and, indirectly, their respective members, a financial loss of at least 58,000,000 [sic] via the financial collapse of the Funds." Defendants' Statement of Uncontroverted

---

**2.** Defendants attempt to show that California does have such a heightened standard by citing to (1) a footnote in a 1975 Ninth Circuit decision stating that fraud or stealing is required, based only on the Restatement of Agency, *Funk v. Tifft,* 515 F.2d 23, 26 n. 4 (9th Cir.1975), and (2) a 1936 decision holding that an officer might in fact still be acting for a corporation (rather than adversely to it) even if the officer does get some personal benefit from the transaction. *West American*

*Finance Co. v. Pacific Indem. Co.,* 17 Cal. App.2d 225, 61 P.2d 963 (Cal.App.1936). These citations are unpersuasive in the face of the more straightforward and recent authorities above.

**3.** In any event, Gaiser and QHL's behavior in the Transactions may well meet the heightened standard of total abandonment or adversity required in other jurisdictions.

Facts # 5. They attempt to bridge this inconsistency by styling the uncontroverted fact as the admission by Plaintiffs rather than the underlying fact itself. (To my mind, this effort skirts more uncomfortably close to inconsistent facts impinging on judicial integrity than the "judicial estoppel" concerns Defendants raise over the Lloyds' litigation.) Logic ultimately defeats this attempt to have it both ways. Defendants must show wrongful behavior by QHL that can be imputed to the Funds for the Funds to be in pari delicto, but this same wrongful behavior depleted Funds' assets for the benefit of QHL and thus triggers the "adverse interest" exception to imputation. Without this wrongful behavior, there is no adverse interest exception, but there is also no wrongful conduct to impute to the Funds in the first place.

 While Plaintiff's evidence that QHL benefitted from the Transactions at the expense of the Funds is not strong, it is sufficient to raise a triable issue of fact that QHL acted adversely to the interests of the Funds, so QHL's misconduct should not be imputed to the Funds (unless the sole actor exception to the adverse interest exception applies.) [4]

The fact that QHL is not the sole shareholder in the Funds does not necessarily prevent application of the "sole actor" exception. The weight of authority applies the exception if the agent/officer was either the sole shareholder or the sole manager of the corporation. See, e.g., Lafferty, 267 F.3d at 359–60 (sole ownership or domination grounds for the exception); USACM Liquidating Trust, 764 F.Supp.2d at 1220 ("The sole actor rule is most easily applied when the wrongdoer was also the corporate principal's sole shareholder or when all the corporation's management participated in the wrongdoing.") California law on this point is not entirely clear. In Peregrine, which the Funds rely on for the proposition that sole ownership is required for the exception to apply, the court's language is ambiguous: "Because Hillmann, one of the primary architects of the Ponzi scheme, was also the owner and sole person in control of Peregrine, his fraud is properly imputed to Peregrine." 133 Cal.App.4th at 679, 35 Cal.Rptr.3d 31. In this context, the phrase "owner and sole person in control" could mean that both ownership and control were necessary for the "sole actor" exception to apply, but it could also be read to mean that either sole ownership or control were sufficient to trigger the exception although both happened to be present in Peregrine.[5]

---

**4.** This evidence of self dealing by QHL undermines Plaintiffs' argument that the money flowing to QHL did provide some benefit to the Funds by ensuring QHL could continue to manage the Funds. If QHL was benefitting itself at the Funds' expense, the Funds would have been better served by QHL's failure and the retention of an honest manager. The Operating Agreements provide for the payment of fees to the manager, so the Funds were already paying for the "benefit" of QHL's management. Operating Agreements ¶ 5.7. In any event, the Ninth Circuit has held this type of incidental benefit irrelevant:

> [E]ven if the corporation were to somehow benefit from the wrongdoing of insiders, the insiders' conduct is still not attributable to the corporation if a recovery by the Plaintiff would serve the objectives of tort liability by properly compensating the victims of the wrongdoing and deterring future wrongdoing.

FDIC v. O'Melveny & Myers, 969 F.2d 744, 750–51 (9th Cir.1992) (citing numerous authorities for this proposition). Courts have framed this issue as who is the primary beneficiary. See, e.g., Baena v. KPMG LLP, 453 F.3d 1 (1st Cir.2006); FDIC v. Ernst & Young, 967 F.2d 166, 171 (5th Cir.1992), reh'g denied 976 F.2d 732, 1992 U.S.App. LEXIS 26696 (5th Cir. Oct. 1, 1992).

**5.** The Funds argue that the Peregrine decision imputed fraud from the individual (Hillman) to his wholly-owned corporation Peregrine

■ In the absence of sole *ownership*, the "sole actor" exception does require sole *control* by QHL in the misconduct at issue. Some courts describe the sole control requirement conversely: the "sole actor" exception should not apply if "at least one decision-maker could have stopped the fraud" (*Industrial Enters. of Am., Inc. v. Mazzuto (In re Pitt Penn Holding Co.)*, 484 B.R. 25, 39–41 (Bankr.D.Del.2012)) or "where it has not been established that all relevant decisionmakers for the corporation were engaged in the fraud" *McHale*, 2011 WL 6990187 at 6, 2011 U.S. Dist. LEXIS 151680 at 18 (quoting *Casey v. U.S. Bank Nat. Assn.*, 127 Cal.App.4th 1138, 1143, 26 Cal.Rptr.3d 401 (Cal.Ct.App. 4th Dist.2005)).[6] QHL did not have sole control over the Transactions. Under the Operating Agreements, QHL needed the consent of a majority of the member shares to enter into a transaction that presented a conflict of interest between QHL and the Funds. There is a material issue of fact whether these Transactions benefited QHL at the expense of the Funds, which would be a conflict of interest, so it is a disputed issue of fact whether QHL was the sole decisionmaker under the Operating Agreements. (Without knowing all of the particulars of the Transactions, it is possible that they would have required majority member consent under other provisions of ¶ 5.4 of the Operating Agreements.)

Defendants' "phalanx" of authority that the adverse interest exception should not be applied to these facts is inapposite: the cases cited by Defendants usually involve corporations used by their principals to steal from outsiders, while QHL's wrongdoing was "theft" from the Funds themselves. And that distinction is crucial in the case law. Defendants point out the many similarities between this case and the facts underlying both *Peterson v. Winston & Strawn, LLP*, 2012 WL 4892758, 2012 U.S. Dist. LEXIS 147653 (N.D.Ill. Oct. 10, 2012) and *Peterson v. McGladrey & Pullen*, 676 F.3d 594 (7th Cir.2012) in which both courts imputed to several hedge funds the fraud of their corporate manager—thereby allowing the accounting firm and law firm involved an *in pari delicto* defense against an action by the hedge funds' bankruptcy trustee. Notwithstanding these similarities, the differ-

---

(which is similar to QHL), but that it did not impute the fraud to the funding entities (which are quite similar to the Funds in this case). That distinction is not meaningful, however, because the opinion only considered whether Peregrine's claims against Sheppard, Mullin were barred by unclean hands.

6. Defendants argument that "every federal Court of Appeals to have considered the issue has held that the presence of people who could have stopped the fraud is immaterial to the imputation analysis" (Reply at 20) ignores inconvenient facts in each cited case that distinguish it from the present circumstances. Both *Baena* and *Ernst & Young* did not consider the "sole actor" exception, because they determined that the managers were in fact acting to "primarily" "benefit" the corporation. 453 F.3d at 8, 967 F.2d at 171. (*Baena* did however reject the 9th Circuit's analysis in *O'Melveny*, discussed below.) In *Breeden v.*

*Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.)*, 336 F.3d 94 (2d Cir. 2003), the innocent independent directors were "impotent to actually do anything." 336 F.3d at 101. The innocent directors in *Official Committee of Unsecured Creditors v. Coopers & Lybrand*, 322 F.3d 147 (2d Cir. 2003) likewise appear to have been without corporate authority to stop the fraud; their suggested means of preventing it would have been to implore creditors or an underwriter to intervene and rescue the corporation. *Lafferty* did summarily dismiss the idea that "the possible existence of any innocent independent directors" would preclude application of the "sole actor" rule, but the wrongdoing officer was the sole shareholder of these corporations and there was no assertion that the possibly innocent directors had the authority to stop the fraud. 267 F.3d at 360.

ences between this situation and the Peterson ones are ultimately more significant:

First, the Trustee contends that the pari delicto defense is inapplicable, as a matter of Illinois law, because Bell was acting adversely to the interest of the Funds. The district court sensibly concluded that Cenco dooms this argument. Cenco predicted that Illinois would hold that fraud by corporate managers is imputed to the corporation where "managers are not stealing from the company— that is, from its current stockholders— but instead are turning the company into an engine of theft against outsiders". *Cenco Inc. v. Seidman & Seidman,* 686 F.2d [449] at 454 [ (7th Cir. 1982) ]. Thirty years have passed, and no court in Illinois has disagreed with this understanding. Bell was not stealing from the Funds, whether or not he was using them to snooker people who had money to invest.

*McGladrey,* 676 F.3d at 599. (The Northern District of Illinois in *Winston & Strawn* relied on the 7th Circuit's decision *McGladrey* to conclude that the principal was not acting adversely to the hedge funds. 2012 WL 4892758 at 4–5, 2012 U.S. Dist. LEXIS 147653 at 11–12.) QHL stole from the Funds, whereas the hedge funds in *McGladrey* and *Winston & Strawn* were used to steal from others. Likewise, in *Cobalt Multifamily Investors I, LLC v. Arden,* 857 F.Supp.2d 349 (S.D.N.Y.2011), the securities violations by the principals benefited the corporations they controlled, at the expense of outsiders. *Knauer v. Jonathon Fin. Group, Inc.,* 348 F.3d 230 (7th Cir.2003) also involved a Ponzi scheme in which the corporations were used to bilk money from investors and the defendants' involvement in the Ponzi scheme was quite minor. *Mosier v. Callister, Nebeker & McCullough,* 546 F.3d 1271 (10th Cir.2008)(operation of debtor as Ponzi scheme was not an "adverse interest" where wrongdoing management pursued advantages *for* debtor).

In addition to the adverse interest exception, California courts also refuse to impute the acts or knowledge of an officer in a situation where that officer has no power to bind the corporation. *Peregrine,* 133 Cal.App.4th at 679, 35 Cal.Rptr.3d 31; *McHale,* 2011 WL 6990187 at 5–6, 2011 U.S. LEXIS 151680 at 17; *Meyer v. Glenmoor Homes, Inc.,* 246 Cal.App.2d 242, 264, 54 Cal.Rptr. 786 (Cal.Ct.App. 1st Dist.1966), *reh'g denied,* 246 Cal.App.2d 242, 55 Cal.Rptr. 502 (Cal Ct.App. 1st Dist. 1966). QHL's lack of authority under the Operating Agreements to bind the Funds to the Transactions also raises this exception to imputation.

Finally, the Funds argue that the Defendants should not be able to shield themselves from liability using this imputation theory in the face of their own wrongdoing. In a remarkably similar set of circumstances, the Ninth Circuit stated:

Furthermore, we note that O'Melveny cannot invoke an estoppel defense unless it is innocent itself. See, e.g., *Meyers v. Moody,* 693 F.2d 1196, 1208 (5th Cir. 1982) ("A party may not invoke an estoppel for the purpose of shielding himself from the results of his own fraud, dereliction of duty, or other inequitable conduct."), cert. denied, 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983). We conclude that ADSB has a corporate identity distinct from that of its wrongdoing officers.

*FDIC v. O'Melveny & Myers,* 969 F.2d 744, 751 (9th Cir.1992). Thus, the court ruled that O'Melveny could not attribute fraud committed by a bank's sole shareholders to the bank itself and thereby use an "unclean hands" defense to bar the bank's receiver's professional negligence action against O'Melveny. The prece-

dential weight of this opinion is unclear, however. The Supreme Court reversed and remanded with instructions to determine the issue under state rather than federal law. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 2053, 129 L.Ed.2d 67 (1994). On remand, the Ninth Circuit (rather testily) maintained that their earlier opinion had been on the basis of state law. *FDIC v. O'Melveny & Myers*, 61 F.3d 17 (9th Cir.1995). This subsequent decision states "we reach the same conclusion as we did the last time." 61 F.3d at 19. If this means that the earlier ruling stands, Defendants cannot use an equitable doctrine of *in pari delicto* to shield themselves from the consequences of any of their "dereliction of duty, or inequitable conduct." However, this second Ninth Circuit decision could be read as holding only that an equitable defense like unclean hands cannot be asserted against "a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law." *Id.* The Plaintiffs, as debtors-in-possession, at least arguably fall within the protection of this more narrow interpretation of the subsequent *O'Melveny* ruling.

This court does not need to determine whether O'Melveny offers the Funds an additional defense against *in pari delicto*. It is a matter of disputed fact whether QHL had the sole authority, or in fact any authority, to enter into the Transactions. Accordingly, both the "adverse interest" and "no authority to act" exceptions prevent imputation of QHL's wrongful actions in the Transactions to the Funds for the purposes of this summary judgment motion.

*Judicial Estoppel*

■ Judicial estoppel "prohibit[s] parties from deliberately changing positions according to the exigencies of the moment" and so "where a party assumes a certain legal position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed assume a contrary position." *New Hampshire v. Maine*, 532 U.S. 742, 749–50, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). It has been applied not only to where the party has won the previous action, but also to where the party obtained a favorable settlement. *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 604–06 (9th Cir.1996). [REDACTED]

The Supreme Court has provided the following guidelines for the decision to invoke judicial estoppel:

Although we have not had occasion to discuss the doctrine elaborately, other courts have uniformly recognized that its purpose is "to protect the integrity of the judicial process," by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." Because the rule is intended to prevent "improper use of judicial machinery," judicial estoppel "is an equitable doctrine invoked by a court at its discretion." Courts have observed that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." Nevertheless, several factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled," Absent success in a prior proceeding, a party's

later inconsistent position introduces no "risk of inconsistent court determinations," and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire v. Maine,* 532 U.S. at 749–751, 121 S.Ct. 1808 (citations omitted).

Defendants cite the following "admissions" by the Funds in the context of their attempts to recover from Lloyd's. (Italicized language was left out of quotations in Defendants' Memorandum of Points and Authorities. The Court notes that some of these omissions change the meaning of the quoted language in a manner favorable to Defendants.)

> [E]ach of the acts of the officers and employees of Quality Homes Loans are deemed to be acts of employees of the Funds *for purposes of coverage under the fidelity bond.*

10/23/09 Letter by Jay Robinson, counsel to the Funds, sending a Proof of Loss to Scott Schmookler, counsel to Lloyd's (Defendants' Exhibit X) at 7.

> "Employees" as defined by the subject insurance policies and California case law, have engaged in certain dishonest and fraudulent acts which have resulted in losses to THE FUNDS *during the subject policy periods, well in excess of the combined limits of the primary and excess bond policies.*

Complaint dated 4/15/10 (Defendants' Exhibit F) ¶ 9.

> Plaintiff's FAC alleges *that under Coverage (A),* "The primary bond insurance, and by reference, the excess bond insurance, provided by their terms that as to 'fidelity' matters, the Defendants under such policies would indemnify the insureds, including THE FUNDS, for among other damages … Loss re-

sulting solely and directly from one or more dishonest or fraudulent acts by an employee …" and that such employees "have engaged in certain dishonest and fraudulent acts which have resulted in losses to THE FUNDS *during the subject policy periods, well in excess of the combined limits of the Primary and Excess Bond Policies.*

Plaintiffs" (the Funds) Opposition to Defendants' (Lloyd's) Motion to Strike in the Bond Action (Defendants' Exhibit H) at 1:20–29. This sentence is simply quoting the Complaint, which Defendants have already quoted.

> *Plaintiff admits that, up to the filing of its bankruptcy, it did not have any employees but*
>
> Plaintiff asserts that under California law, the employees of QHL were deemed to be employees of the Plaintiff for the limited purpose of triggering coverage under the subject Bond Policies under insuring Agreement "A."

Plaintiffs' (the Funds) Responses to Requests for Admissions (Defendants' Exhibits L & N) at 15.

> *[t]he Plaintiff believes that the claims submitted by Plaintiff to Defendants are covered under insuring Agreement A of the bonds in that the* losses were caused by dishonest and fraudulent acts by persons deemed to be employees of the funds under California case law…."

Plaintiffs' (the Funds) Responses to Form Interrogatories (Defendants' Exhibits O & P) at 10.

> given that the Funds had no actual employees, the employees of QHL are deemed to be employees of the Funds for purposes of bond coverage under California law (*see Research Equity Fund v. INA,* 602 F.2d 200 [ (9th Cir. 1979) ]).

1/23/10 Letter by Jay Robinson, counsel to the Funds, to Scott Schmookler, Esq. (Defendants' Exhibit Z) at 2.

Invocation of judicial estoppel is in my discretion and, after considering the guidelines set by the Supreme Court in *Maine v. New Hampshire,* I will not invoke it here. As a group, these "admissions" are generally limited by the use of "deemed" or "for the purposes of bond coverage," or the like. The Funds quite clearly limited their assertion that employees of QHL were employees of the Funds to the context of coverage under the Lloyd's bonds. Claiming QHL employees were employees of the Funds for the limited purpose of insurance coverage is "not inconsistent" with arguing that they were not employees of the Funds for other purposes; neither the Superior Court nor this court would "appear to be misled." The Funds' argument in the Bond Action makes sense: unless QHL's employees were deemed to be employees of the Funds, the loyalty bond issued in favor of the Funds was meaningless. If in fact Lloyd's had been paid to issue a bond covering malfeasance by "employees" of the Funds, and the Defendants in this proceeding did commit wrongful actions that injured the Funds, the Funds' recovery from both Lloyd's and Defendants using a different definition of employee in different contexts does not confer an unfair advantage on the Funds. In sum, I do not need to dismiss this suit to preserve the integrity of the courts.

Motion denied.

### Evidentiary Objections

*Plaintiffs' Objections to Evidence Offered by Defendants*

Plaintiff objections to Defendants' statements of uncontroverted *fact* (whether as irrelevant, immaterial, a misstatement of the evidence, lacking foundation or otherwise) are not objections to *evidence* and will not be considered.

Although Plaintiff has not cited the Federal Rules of Evidence underlying its objections and objections without such citations may be deemed waived under LBR 9013–1(i)(2), I will consider the remaining objections:

— Objections to Defendants' Exhibits F–H—overruled
— Objections to Defendants' Exhibits J–T—overruled
— Objections to Defendants' Exhibits U, X–BB—overruled
— Objection to Defendants' Exhibit CC—sustained to the extent that witness lacks personal knowledge or states an opinion not within FRE 701

*Defendants' Evidentiary Objections to Declaration of Randy Miller*

Sustained to the extent witness lacks personal knowledge.

*Plaintiffs' Evidentiary Objection to Excerpts from Brief from Peregrine in support of Reply*

Overruled.