Filed 5/2/25  MobilityPay Holdings v. RBSM CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MOBILITYPAY HOLDINGS, INC. f/k/a CONTENT CHECKED HOLDINGS, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> RBSM, LLP, <br><br> Defendant and Respondent. | B337159 <br><br> (Los Angeles County Super. Ct. No. BC721119) <br><br><br> ORDER MODIFYING OPINION AND DENYING REHEARING <br><br> NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on April 9, 2025, be modified as follows:

1. On page four, in the second sentence of the paragraph beginning "In April 2015," replace "By July 2015" with "Around that time." The full sentence should read:

   > Around that time, Finstad owned more than 96 percent of that stock, although no matters were submitted to the other shareholders for a vote.

2. On page fourteen, at the end of the sentence beginning "Thus, we reject Content Checked's argument that the case law already requires," add the following footnote 3 and renumber the subsequent footnotes accordingly:

   > In a petition for rehearing, Content Checked argues that it was denied its right under Government Code section 68081 to distinguish the cases we cite, purportedly on the ground that they address a different "branch of alter ego." We reject this argument. This statute grants the right to brief new *issues*, and the *issue* of whether the sole actor must own *all* of the corporation was extensively argued in the parties' briefs. It is well settled that "Government Code section 68081 does *not* give the parties a right to submit supplemental briefs when an appellate court relies upon authority that was not briefed by the parties . . . ." (*Gee v. Greyhound Lines, Inc.* (2016) 6 Cal.App.5th 477, 487, fn. 6; *People v. Alice* (2007) 41 Cal.4th 668, 679.)

3. On page fourteen, in the sentence beginning "We also

reject Content Checked's argument," after "raised for the first time at oral argument," add "and again in its petition for rehearing," so that the full sentence reads:

> We also reject Content Checked's argument—raised for the first time at oral argument and again in its petition for rehearing—that we must evaluate the extent of the sole actor's ownership at a particular moment in time; apart from being forfeited (*People v. Crow* (1993) 6 Cal.4th 952, 960, fn. 7), it lacks merit where, as here, the alleged negligence is RBSM's failure to uncover the sole actor's perpetual misrepresentations and the sole actor controlled the majority (at times, vast majority) of valueless and powerless stock throughout the time of those perpetual misrepresentations.

*       *       *

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

HOFFSTADT, P.J.          KIM, J. (D.)          WILLIAMS, J.*

_____

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 4/9/25  MobilityPay Holdings v. RBSM CA2/5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MOBILITYPAY HOLDINGS, INC. f/k/a CONTENT CHECKED HOLDINGS, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> RBSM, LLP, <br><br> Defendant and Respondent. | B337159 <br><br> (Los Angeles County Super. Ct. No. BC721119) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Douglas W. Stern, Judge.  Affirmed.

Kwun Bhansali Lazarus, Asim M. Bhansali, Nicholas A. Roethlisberger, and Elizabeth H. Dinh for Plaintiff and Appellant.

Goldberg Segalla and Todd M. Thacker for Defendant and Respondent.

* * * * * *

A corporation's sole decision maker embezzled close to $1 million of the corporation's funds, then hired an independent accounting firm to certify the accuracy of the corporation's inaccurate financial statements while lying to the firm and providing it forged documents for review. The corporation later sued the accounting firm for malpractice in not detecting the inaccuracies. After a jury found the firm negligent and awarded the corporation damages, the trial court vacated the jury's verdict based on the court's ruling that the equitable doctrine of unclean hands barred the corporation's claim because the corporation and the embezzler were one and the same. The corporation appeals this ruling, and also seeks a higher damages award and prejudgment interest should the jury verdict be reinstated. Because the trial court's unclean hands ruling was not erroneous, we have no occasion to reach the further issues and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *Kristian Finstad (Finstad) controls Content Checked Holdings, Inc. (Content Checked)*

In 2014, Content Checked was a corporation that owned an application for mobile devices that allowed users to scan the labels of food items and obtain information about the allergens in those items.

At that time, Finstad was Content Checked's only officer, the only member of its board of directors, its only full-time

2

employee (as Content Checked otherwise hired contract workers), and the owner of nearly all of its stock. Finstad was the only person with authorized access to Content Checked's bank accounts. In sum, Finstad was the corporation's sole decision maker.

**B.      *Finstad embezzles nearly $1 million***

Between April 2014 and March 2015, Finstad embezzled $991,453.49 from Content Checked's bank accounts.

**C.      *Finstad hires RBSM, LLP (RBSM) to certify the accuracy of Content Checked's financial statements***

After Content Checked's prior accounting firm resigned because it "no longer had faith in the integrity of [Content Checked's] management," the corporation in April 2015 hired RBSM—a different public accounting firm—to certify the accuracy of its financial statements, starting with its March 31, 2015, statement.

By this point in time, Finstad had hired David Wells (Wells) to serve part time and on an interim basis as Content Checked's "for-hire" Chief Financial Officer. But Finstad did not give Wells access to Content Checked's bank accounts or financial records, and Wells "performed no management-related activities."

**D.      *RBSM certifies the accuracy of Content Checked's financial statements based on fraudulent documents Finstad provided***

After hiring RBSM, Finstad provided RBSM with (1) a forged bank statement indicating that Content Checked had a balance of $1,235,624.38 in its bank account and (2) a letter, signed by himself and Wells, stating that they had "made available" "all" "[f]inancial records" and had "no knowledge of any fraud or suspected fraud affecting the Company." The actual

3

balance of Content Checked's bank account was $17,613.59, as Finstad had embezzled the vast majority of the funds before hiring RBSM.

In April 2015, Content Checked issued shares of stock. By July 2015, Finstad owned more than 96 percent of that stock, although no matters were submitted to the other shareholders for a vote.

Based on the forged documents and false representations, RBSM issued a letter on May 21, 2015, stating that Content Checked's March 31, 2015, balance sheet showing "cash and cash equivalents" of $1,146,197 was accurate.

In late 2015 and early 2016, Finstad and Wells co-signed several filings with the Securities and Exchange Commission (SEC) on behalf of the corporation.

**E.** ***Content Checked secures a $4.5 million loan from Hillair Capital Management LLC (Hillair)***

In September 2015, Hillair, a venture capital fund, agreed to loan Content Checked $4.5 million and disbursed $4.3 million to Content Checked; although Hillair retained an option to acquire stock in Content Checked in lieu of repayment, Hillair never exercised that option.

By November 2015, Content Checked's stock was owned by 91 individuals and Finstad owned nearly 57 percent of that stock, although those other shareholders were never asked to vote on any matters.

**F.** ***Finstad embezzles the Hillair loan money from Content Checked***

Almost immediately after Hillair transferred the $4.3 million to Content Checked, Finstad embezzled it.

In October 2016, RBSM sent a letter to Finstad reporting that it "found material inconsistencies between the cash balances" of Content Checked's "primary bank account" and the "asserted balance in [its] accounting records." After assurances from Finstad, RBSM withdrew the letter the next day.

### G.     *The fallout from Finstad's embezzlement*

In June 2017, Finstad hired John Martin (Martin) to serve as Content Checked's President, Secretary, and General Counsel. The only person Martin ever dealt with was Finstad; Martin had no interaction with the "contract CFO," Wells.

By that time, Hillair had sued Content Checked for repayment. Representing Content Checked, Martin entered into a stipulated settlement and judgment in Hillair's favor for $7,114,625.43. Pursuant to negotiations between Martin and Hillair, Hillair eventually agreed to accept $985,000 in satisfaction of that judgment debt.

Martin also staved off potential litigation by Honest Cooking Media (Honest Cooking), a company that operated a website focused on food, wine, and travel. Content Checked had acquired Honest Cooking in 2016 and had hired its founder as Content Checked's Chief Creative Officer, which was a marketing position. Before Honest Cooking and its founder sued Content Checked, Honest Cooking bought back its website for $1 and Martin agreed to allow Honest Cooking to share $100,000 of any funds Content Checked recovered in litigation with other parties.

When Finstad did not produce a $4.9 million check representing Hillair's loan proceeds that Finstad claimed to have in a safe deposit box, Martin in July 2017 forced Finstad out of Content Checked's management and got him to cede all of his

5

corporate stock—all in exchange for Finstad's promise to repay the money he embezzled.

Finstad repaid nothing and fled the country.

Content Checked then became MobilityPay Holdings, Inc. (MobilityPay) and developed a new application for mobile devices to help persons who do "gig" work for platforms like DoorDash and Uber.

## II.     Procedural Background

### A.     *Lawsuit*

In September 2018, Content Checked (through its successor company MobilityPay) sued RBSM for negligence in certifying Content Checked's financial records in 2015 and 2016.

### B.     *Jury trial*

The matter proceeded to a six-day jury trial in August 2023.  The jury found that RBSM had negligently performed its audit and awarded Content Checked damages of $1,136,000, comprised of $1,085,000 as the "cost to resolve [the] claims of Hillair . . . and Honest Cooking" and $51,000 as the "cost to remediate Content Checked's misstated financial statements."

Content Checked filed two sets of post-trial motions.  It filed a motion for new trial and a motion for judgment notwithstanding the verdict, arguing in both (as pertinent here) that it was entitled to an additional $2,695,044 in damages reflecting the full amount of unpaid loan proceeds to Hillair rather than the amount Hillair agreed to accept in satisfaction of that judgment.  Content Checked also filed a motion seeking prejudgment interest starting on September 1, 2022.  The trial court denied those motions.

6

## C. *Bench trial on affirmative defense of unclean hands*

During trial, RBSM filed a motion for nonsuit seeking to bar Content Checked from any recovery on the ground that Content Checked had unclean hands because its lawsuit sought recompense for RBSM's failure to detect the fraud that Finstad— the person who controlled the corporation—himself perpetrated against RBSM. The trial court construed the motion as a request to have the court, as a trier of fact, try the affirmative and equitable defense of unclean hands using the evidence from trial.

In November 2023, the trial court issued its final statement of decision vacating the jury's verdict on the ground that Content Checked's unclean hands barred it from recovery.

Because it was undisputed at trial that Finstad had unclean hands (as he had lied and presented forged documents to RBSM), the court devoted most of its statement of decision to whether Finstad's unclean hands should be attributed to Content Checked. The court ruled it should.

The court found that Finstad was the "only decision maker" at Content Checked because, as the only "true officer" and only board member, he "wore all executive-level hats" for the corporation.

The court noted that Wells was listed as the corporation's Chief Financial Officer, but found that Wells was an "officer in name only" who merely "len[t] his name and signature," and that he was not a "real participant" because he was "'out of the loop' when it came to [the corporation's] finances" and had no access to any of the corporation's financial records. Wells's status as "mere window-dressing" was confirmed by Martin's total lack of interaction with him while Martin simultaneously served in

7

many of Content Checked's key management positions. The court rejected Content Checked's assertion that Wells had the power to stop Finstad's fraud as "unsupported by any evidence." The court found that no other officer or contract worker "participated in any management, decision making, [or] oversight" except for Honest Cooking's founder, who worked solely on marketing for Content Checked.

The court noted that Finstad did not own 100 percent of Content Checked's stock, but found that the other shareholders—whose stock was worth nothing given the state of the corporation's finances—"exercised absolutely no role" and were "wholly uninvolved"; to allow their nominal and meaningless ownership to block application of the unclean hands doctrine, the court reasoned, would lead to "an inequitable outcome."

**D.** *Appeal*

After the trial court entered judgment for RBSM, Content Checked timely filed this appeal.

## DISCUSSION

Content Checked's chief argument on appeal is that the trial court erred in vacating the jury verdict based on RBSM's affirmative defense of unclean hands.[1] To the extent Content Checked challenges the trial court's understanding of the legal contours of the equitable defense of unclean hands, our review is de novo; to the extent it challenges the trial court's factual

---

[1]  Content Checked also argues that the court erred in (1) not increasing the damages award to reflect the full loan amount from Hillair, and (2) not awarding prejudgment interest. However, these arguments are only relevant if we reinstate the jury verdict. Because we do not, we have no occasion to consider these further arguments.

findings that the defense applies, our review is for substantial evidence.  (*Padideh v. Moradi* (2023) 89 Cal.App.5th 418, 436-438 (*Padideh*).)

## I.    Pertinent Law

The doctrine of unclean hands is an affirmative defense "in both equitable actions decided by a court and legal actions . . . decided by a jury."  (*Padideh*, *supra*, 89 Cal.App.5th at p. 437; *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 56.)  Unclean hands encompasses "a number of disparate doctrines," all of which are grounded in equity and apply "'where it would be inequitable to grant the plaintiff *any* relief.'"  (*Blain v. Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1059; *Bank of America, N.A. v. Roberts* (2013) 217 Cal.App.4th 1386, 1400.)  Of particular relevance here is the doctrine of in pari delicto, which prohibits courts from granting relief to a party for injuries sustained in a transaction when that party has engaged in "unconscientious conduct in th[at] transaction."  (*Burton v. Sosinsky* (1988) 203 Cal.App.3d 562, 573-574; *Taylor v. Fields* (1986) 178 Cal.App.3d 653, 666; see generally *Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 820 [whether the defense applies turns on "'"the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries"'"].)  Like all equitable defenses, the unclean hands defense looks to the "realities of the situation" and considers the totality of the circumstances (*Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63 Cal.2d 199, 219; *CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 647; *Blain*, at p. 1062), and bars a wrongdoer from obtaining relief in the courts as a means of "prevent[ing] the guilty party from reaping the benefit of [its] wrongful conduct" (*Tri-Q, Inc.*, at p. 218) and preventing the courts from becoming

9

"'abetter[s] of iniquity'" (*Burton*, at p. 574, quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.* (1945) 324 U.S. 806, 814).

The application of the unclean hands defense is more nuanced when the party to be barred from recovering relief is a corporation. Although the conduct of a corporation's agent is generally imputed to the corporation (*Uecker v. Zentil* (2016) 244 Cal.App.4th 789, 797 (*Uecker*); *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 679 (*Peregrine*)), California law provides that "[a]n agent can never have authority . . . to do an act which is . . . a fraud upon the principal" (Civ. Code, § 2306; *Meyer v. Glenmoor Homes, Inc.* (1966) 246 Cal.App.2d 242, 264). Thus, the fraudulent conduct of a corporate agent constituting unclean hands will generally *not* be attributed to the corporation itself.[2] (*Uecker*, at pp. 797-798; *Peregrine*, at pp. 679-680.) But there is an exception to this exception: If the corporate agent is the "sole actor" in the corporation, then "agent and principal are effectively" "alter egos" and "one and the same"—and the agent's unclean hands *is* imputed to the corporation, thereby barring the corporation from obtaining relief. (*Uecker*, at p. 798; *Bash*, *supra*, 834 F.3d at p. 677.)

Whether a corporate agent qualifies as a sole actor turns on whether the corporation is (1) controlled by the agent and (2) owned by the agent. (*Uecker*, *supra*, 244 Cal.App.4th at p. 798.)

---

[2] In other jurisdictions, this is known as the "adverse interest exception" because it is an exception to the general rule imputing an agent's conduct to the corporate principal. (E.g., *Bash v. Textron Fin. Corp. (In re Fair Fin. Co.)* (6th Cir. 2016) 834 F.3d 651, 676-677 (*Bash*).)

With respect to control, the sole actor doctrine applies where the agent has sole decision-making authority. (*Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1143 (*Casey*); *Golden State TD Invs., LLC v. Andrews Kurth LLP (In re Cal. TD Invs., LLC)* (Bankr. C.D.Cal. 2013) 489 B.R. 124, 132 (*Golden State*).) Thus, if the corporation had "at least one innocent decision-maker who could have stopped the wrongdoing if he or she had known of it," the agent engaging in malfeasance is not the corporation's sole decision maker and the sole actor doctrine will not apply. (*Bash, supra*, 834 F.3d at pp. 677-679; *Golden State*, at p. 132; *Smith v. Andersen L.L.P.* (D. Ariz. 2001) 175 F.Supp.2d 1180, 1199.)

## II.    Analysis

The trial court did not err in vacating the jury's verdict on the basis of the unclean hands defense. The undisputed evidence at trial established that Finstad had unclean hands (because he lied to RBSM and presented fraudulent documents to RBSM after asking RBSM to certify the accuracies of Content Checked's financial reports), and that Finstad's unclean hands were related to the injury underlying Content Checked's lawsuit (because the corporation was suing RBSM for negligence arising out of that certification). Substantial evidence supports the trial court's factual finding that Finstad was the sole actor in the corporation: The evidence supported the court's findings that only Finstad exercised any decision-making authority for Content Checked, that Finstad owned nearly all of the stock, and that Finstad excluded the other shareholders from any involvement and deprived their stock of any value. Under these circumstances, the court did not err in finding that Content Checked and Finstad were one and the same, in attributing Finstad's unclean hands to

11

Content Checked, and in barring Content Checked from recovering damages from RBSM for negligence in not detecting the fraud Content Checked had visited upon RBSM.

Content Checked resists this conclusion with what boils down to three arguments.

First, Content Checked argues that the trial court was precluded by law from applying the sole actor doctrine because Wells was an innocent decision maker who had the power to stop the fraud at Content Checked because Wells could have (1) refused to sign the SEC reports and (2) refused to sign the letter to RBSM representing that he and Finstad had "no knowledge of any fraud or suspected fraud affecting the Company." This argument ignores the trial court's findings that Wells was an "officer in name only" because Wells lacked both the knowledge about the corporation's finances and the ability to access the corporation's financial records. To the extent Content Checked asks us to reweigh the evidence and come to a different conclusion about Wells's role, that is beyond our purview where, as here, we are engaged in substantial evidence review. (*In re Caden C.* (2021) 11 Cal.5th 614, 640.) And to the extent Content Checked is asking us to hold that appointing a single person to a corporate position but denying them any decision-making power or access to information precludes the application of the sole actor doctrine, we decline to do so; such a person's power to stop wrongdoing is wholly theoretical and not actual, and our task is to examine the *realities* of the situation. We will not pretend that a corporate insider has decision-making power when he does not, merely because, in theory, he *should* have that power. And contrary to what Content Checked suggests, our conclusion is not tantamount to concluding that Wells possessed decision-making

12

power but declined to use it.  Content Checked's subsidiary arguments that others were innocent decision makers also fail for the same reasons.

Second, Content Checked argues that Finstad cannot be deemed a sole actor because Finstad did not own 100 percent of the corporation's stock.  For support, it cites language from various decisions suggesting that *complete* ownership is a prerequisite to being deemed a sole actor.  To be sure, there are California cases referring to control *and* ownership (see *Uecker*, *supra*, 244 Cal.App.4th at p. 798 [applying sole actor doctrine when "the principal was 'owned' *and* 'controlled by' the agent," italics added]; *Peregrine*, *supra*, 133 Cal.App.4th at pp. 679-680 [applying sole actor doctrine where agent was "the owner and sole person in control of" the corporation]; see generally *CADC/RADC Venture 2011-1 LLC v. Bradley* (2015) 235 Cal.App.4th 775, 788-789 ["Under California law, '[o]wnership is a pre-requisite to alter ego liability, and not a mere "factor" or "guideline"'"]) as well as cases from different jurisdictions that note the same (e.g., *Principal Growth Strategies, LLC v. AGH Parent LLC* (Del. Ch. 2024) 2024 Del. Ch. Lexis 17, *48-*50 [declining to apply sole actor doctrine because agent "did not own 100% of the Company"]; *MicroTechnologies, LLC v. Autonomy, Inc.* (N.D.Cal. Sept. 21, 2018) 2018 U.S. Dist. Lexis 162104, *21-*22 ["Most if not all cases applying [the sole actor doctrine] have done so where the [agent] at issue wholly owned the corporate entity"]).  But other California cases have not so required.  Indeed, our Supreme Court has treated an agent and a corporation as alter egos even when there were other innocent shareholders.  (*Riddle v. Leuschner* (1959) 51 Cal.2d 574, 580-581 [noting that "various employees" owned a miniscule portion of

13

stock (eight shares total)]; accord, *USACM Liquidating Trust v. Deloitte & Touche* (9th Cir. 2014) 754 F.3d 645, 648 [concluding agents dominated corporation, even while owning only 83 percent of the stock].) Thus, we reject Content Checked's argument that the case law already requires a rigid requirement of 100 percent ownership by the agent, and we decline to create such a requirement in a situation—like the one here—where the other shareholders own valueless stock and have no involvement whatsoever in any corporate decisions (and thus no opportunity to acquire the information on which a derivative suit to protect the corporation might be brought). We also reject Content Checked's argument—raised for the first time at oral argument—that we must evaluate the extent of the sole actor's ownership at a particular moment in time; apart from being forfeited (*People v. Crow* (1993) 6 Cal.4th 952, 960, fn. 7), it lacks merit where, as here, the alleged negligence is RSBM's failure to uncover the sole actor's perpetual misrepresentations and the sole actor controlled the majority (at times, vast majority) of valueless and powerless stock throughout the time of those perpetual misrepresentations. At bottom, precluding the sole actor doctrine in this case would grant scheming actors a blueprint for keeping the corporation's hands clean.

Third and lastly, Content Checked argues that we should create a public-policy-based exception to the unclean hands defense for corporate auditors. In support of its argument, Content Checked cites several cases in which the courts have declined to apply the unclean hands defense when doing so would contravene the legislative policy animating a statute. (See *Mendoza v. Ruesga* (2008) 169 Cal.App.4th 270, 282-283 [declining to apply unclean hands defense when doing so would

14

undermine a statute aimed at protecting people from unscrupulous immigration consultants]; *Carter v. Cohen* (2010) 188 Cal.App.4th 1038, 1050 [declining to apply unclean hands defense when doing so would undermine a rental control ordinance barring excessive rent charges]; *East West Bank v. Rio School Dist.* (2015) 235 Cal.App.4th 742, 744-745 [declining to apply unclean hands defense when doing so would undermine a public contracting statute]; *Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 543-544 [declining to apply unclean hands defense when doing so would undermine the unfair business practices statute].)  Content Checked urges independent auditors "assume[] a public responsibility transcending any employment relationship with the client" (*United States v. Arthur Young & Co.* (1984) 465 U.S. 805, 817-818, italics omitted), such that public accountants should be subject to suit even by persons who lie to them and then blame them for not catching the lies.  We disagree.  *Arthur Young* itself held that there was no work product privilege for accountants; it did not purport to proclaim any universal public policy.  (*Ibid.*)  More to the point, Content Checked points to no *California* statute that embodies our Legislature's intent to allow individuals who defraud public accountants to recover despite their misconduct.  Without such Legislative direction, we decline to fashion a new exception to the unclean hands defense.

## DISPOSITION

The judgment is affirmed.  RBSM is entitled to its costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

15

_____, P. J.
HOFFSTADT

We concur:


_____, J.
KIM (D.)


_____, J.
WILLIAMS*

---

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.